Enrique CAMACHO, Gladys Camacho, and Leonarda Titone, individually and on behalf of all other persons similarly situated, Plaintiffs,

Aida Figueroa, as Administratrix of the Estate of William Figueroa, Intervenor-Plaintiff-Appellant,

William Boyd, individually and on behalf of all other persons similarly situated, Intervenor-Plaintiff-Appellant,

v.

Cesar PERALES, Commissioner of the New York State Department of Social Services, James Krauskopf, Administrator of the New York City Human Resources Administration and Commissioner of the New York City Department of Social Services, and Shirley Harvey-Cook, Commissioner of the Orange County Department of Social Services, Defendants-Appellees.

No. 1163, Docket 85–7139.

United States Court of Appeals, Second Circuit.

Argued May 8, 1985.

Decided Jan. 24, 1986.

Rene H. Reixach, Rochester, N.Y. (Greater Upstate Law Project, Rochester, N.Y., Toby Golick, Constance Carden, Legal Services for the Elderly, New York City, Page Lockhart, Mid-Hudson Legal Services, Poughkeepsie, N.Y., on brief), for intervenors-plaintiffs-appellants.

Maryellen Weinberg, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., New York City, on brief), for defendant-appellee Perales.

Frederick A.O. Schwartz, Jr., Corp. Counsel of the City of New York, New York City (David Dreuding, Asst. Corp. Counsel, New York City, of counsel), for defendant-appellee Krauskopf, joined the brief of defendant-appellee Perales.

James G. Sweeney, Co. Atty., Goshen, N.Y. (John J. Lee, Jr., Asst. Co. Atty., Goshen, N.Y., of counsel), submitted a brief for defendant-appellee Harvey-Cook.

Before MESKILL, KEARSE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Intervenors-plaintiffs Aida Figueroa and William Boyd ("intervenors") appeal from a final judgment of the United States District Court for the Southern District of New York, John E. Sprizzo, *Judge*, dismissing their class action complaints challenging the method by which defendants Commissioner of the New York State Department of Social Services, *et al.* (collectively the "State"), calculate the Medicaid eligibility of aged, blind, or disabled persons who are not entitled, because of their financial status, to receive Supplemental Security Income ("SSI") benefits and who live with spouses who are not aged, blind, or disabled within the meaning of the SSI program, 42 U.S.C. §§ 1381–1383c (1982) ("ineligible spouses"). Intervenors contended that the State's method violates 42 U.S.C. § 1396a(a) (1982), which requires that states choosing to provide Medicaid to medically needy aged, blind, or disabled persons must employ the "same methodology" in calculating Medicaid eligibility that the federal government employs in determining SSI eligibility. They sought principally (A) a judgment declaring (1) that the State's inclusion of certain income of the ineligible spouse in the computation of the applicant's financial eligibility violates the same-methodology requirement, and (2) that the State must base all of its income allowance calculations on the number of family members in the household; and (B) an order requiring defendants to reimburse all members of the class for unpaid Medicaid benefits that would have been payable if the requested methodology had been used. We conclude (1) that the State's present methodology fails to conform to the SSI methodology in at least two respects, including the respect challenged by intervenors and the respect that intervenors seek to perpetuate. Since we decline to order the perpetuation of a methodology that in any respect violates the same-methodology requirement of federal law, we affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

Under Medicaid, which is a federal and state cost-sharing program through which participating states provide medical assistance to persons whose income and resources are insufficient to cover the costs of necessary medical care, there are two classes of eligible persons: the "categorically needy" and the "medically needy." The categorically needy, *see* 42 C.F.R. § 435.1(b)(ii) (1984), are those persons eligible for cash assistance under either the Aid to Families with Dependent Children ("AFDC") program, 42 U.S.C. § 601 *et seq.* (1982), or the SSI program for persons who have reached the age of 65 or who are blind or disabled, *id.* § 1381 *et seq.* The medically needy, *see* 42 C.F.R. § 435.1(b)(3)(i), are those persons who (a) meet the nonfinancial eligibility requirements for cash assistance under AFDC or SSI, and (b)

have income or resources that exceed the financial eligibility standards of the relevant program but that are considered insufficient to pay for necessary medical care. In a state that has elected to provide Medicaid to medically needy persons, such a person becomes eligible for Medicaid if, during a given period, he incurs medical expenses in an amount equal to or greater than the amount by which his income exceeds the "medically needy income standard" set by the state (termed a "spenddown"). *See* 42 U.S.C. § 1396a(a)(17); 42 C.F.R. §§ 435.831(c) and (d) (1984); N.Y. Admin.Code tit. 18, § 360.5(d) (1985).

Intervenor Boyd is a disabled Medicaid applicant who met all of the requirements for SSI except those as to level of income or resources. Intervenor Figueroa is administratrix of the estate of her late husband, William Figueroa, who was, like Boyd, an SSI-related medically needy Medicaid applicant. New York State provides Medicaid to persons who fall within the definition of medically needy and who "spend down" to the State's medically needy income level. Both intervenors challenge the methodology used by State and local officials to calculate, with respect to the SSI-related medically needy, the level of their income or resources for Medicaid eligibility purposes when they live with spouses who are not eligible for SSI.

## A. *The Statutory and Regulatory Background of SSI and Medicaid*

States that choose to participate in the Medicaid program are required to provide Medicaid to the categorically needy, 42 U.S.C. § 1396a(a)(10)(A)(i), and may, in addition, elect to provide Medicaid to the medically needy, *id.* § 1396a(a)(10)(C). As a state that has chosen to provide Medicaid to the medically needy, New York is required to include in its Medicaid plan "reasonable standards (which shall be comparable for all·groups ...) for determining eligibility for ... medical assistance under the plan...." *Id.* § 1396a(a)(17). A regulation promulgated by the Secretary of the Department of Health and Human Services

("Secretary", "Department") in 1981 provides that the income standard to be used must, in addition, be "(a) [b]ased on family size; [and] (b) [u]niform for all individuals in a covered group." 42 C.F.R. § 435.811 (1984). The statutory section principally at issue here, 42 U.S.C. § 1396a(a)(10)(C)(i) (I–II), requires the State to use, in determining the Medicaid eligibility of the medically needy aged, blind, or disabled, the "same methodology" that is used to determine financial eligibility in the SSI program. That section provides, insofar as is pertinent to this case, as follows:

> the [State's] plan must include a description of ... (III) the single standard to be employed in determining income and resource eligibility [for the SSI-related medically needy] and the methodology to be employed in determining such eligibility, which shall be the same methodology which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals in a State in which such program is in effect....

### 1. *The SSI Methodology*

Under the federal statutory scheme, the maximum benefits payable to an SSI-eligible individual are set at a certain rate; if both husband and wife are SSI-eligible and are living together, the maximum benefits payable to the couple are set at a higher rate. At the time this action was commenced, the Federal benefit rates for eligible individuals and eligible couples were, respectively, $284.30 and $426.40 per month. If the SSI applicant is aged, blind, or disabled and the spouse is not, the following methodology is used to determine the financial eligibility of the applicant.

In the calculation of the applicant's income, the ineligible spouse's income minus certain exclusions and deductions (hereinafter "pertinent income" or "pertinent amount") may be "deemed" available to the applicant and thereby includable in the applicant's "countable income." *See* 20 C.F.R. §§ 416.1161 and 416.1161a (1985). If the pertinent amount of the spouse's

income is "not more than one-half of the Federal benefit rate for an eligible individual," *id.* § 416.1163(c)(1), no portion of the spouse's income is deemed available to the applicant or included in the applicant's countable income. The applicant's countable income is then subtracted from the Federal benefit rate for an eligible individual to determine whether the applicant is eligible for SSI benefits and, if so, the amount to which he is entitled.

If the pertinent amount of the spouse's income is more than half the Federal benefit rate for an eligible individual, the entire pertinent amount is deemed available to the applicant and is included in the applicant's countable income. *Id.* § 416.1163(c)(2). The applicant's eligibility for SSI benefits is then determined by subtracting the total amount of his countable income, including the amount deemed available from his spouse, from the Federal benefit rate for an eligible couple. The logic underlying the choice of which Federal benefit rate is to be the minuend of the equation is that an applicant living with an ineligible spouse is treated as a two-person household only if income of the ineligible spouse is deemed available to the applicant. If income of the ineligible spouse is not deemed available to the applicant, the applicant, despite living with an ineligible spouse, is treated as an individual.

Finally, Department regulations provide that the SSI benefits awarded are to be the lesser of (a) the amount computed by subtracting the applicant's countable income including the ineligible spouse's pertinent income if it is deemed available to the applicant under the above "deeming" rules, from the Federal benefit rate for a couple or (b) the amount arrived at by subtracting only the applicant's countable income from the Federal benefit rate for an individual. *Id.* § 416.1163(c)(3). Thus, if the ineligible spouse's pertinent income is more than one-half the Federal benefit rate for an individual and therefore is deemed available to the applicant, SSI methodology compares (a) the difference between the Federal benefit rate for an eligible couple and the applicant's countable income including the

spouse's pertinent amount, to (b) the difference between the Federal benefit rate for an eligible individual and the applicant's countable income with nothing deemed available from the spouse; whichever difference is smaller determines the applicant's eligibility for SSI benefits and the amount of those benefits, if any.

### 2. *The State's Present Methodology*

The State has set financial thresholds ("medically needy income standards") for Medicaid eligibility for individuals and for households of more than one. When this action was commenced, the State's medically needy income standards for one- and two-person households were, respectively, $350 and $509 per month. Under the State's present method of determining the Medicaid eligibility of the SSI-related medically needy, the pertinent monthly income of the ineligible spouse is automatically deemed available to the applicant even when that income is not more than half the monthly Federal benefit rate for an eligible individual, and it is automatically included in the countable income of the applicant. The total is then subtracted from the State's per-month medically needy income standard for a household of two persons. The remainder determines the amount that the applicant must incur in medical expenses in a given period (the spend-down amount) before he becomes eligible for Medicaid; the amount of his Medicaid benefit will be the amount by which his relevant medical expenses under the Medicaid scheme exceed the spend-down amount in the relevant period.

The State's methodology thus differs from the SSI methodology in several respects. First, the State deems the pertinent income of the ineligible spouse available to the applicant regardless of its amount, whereas SSI methodology would deem the spouse's pertinent income available only if that income were more than one-half of the Federal benefit rate for an individual. Second, the State methodology uses as the minuend of its equation the income level for a household of two even

where no spousal income is deemed available to the applicant, a situation in which SSI methodology would use the individual level as the minuend. And finally, where even SSI methodology would deem spousal income available to the applicant, the State makes no effort, in accordance with SSI methodology, to compare (a) the difference between the State's medically needy income level for a household of two and the applicant's countable income including the spouse's pertinent amount, to (b) the difference between the medically needy income level for a household of one and the applicant's countable income with nothing deemed available from the spouse, in order to allow the smaller difference to govern the applicant's eligibility for Medicaid benefits.

### B. *The State's Prior Methodology and the Proceedings Below*

Prior to August 1982, the State had calculated the Medicaid eligibility of an SSI-related medically needy applicant living with an ineligible spouse by subtracting only the applicant's own countable income from the State's medically needy income standard for a two-person household. In 1982, the State proposed to change its methodology to conform more strictly to the SSI methodology, in that (1) the State would not deem available to the applicant the pertinent income of an ineligible spouse when that income was not more than one-half of the Federal benefit rate for an eligible individual, and (2) whenever the ineligible spouse's income was not deemed available to the applicant, the State would compute Medicaid eligibility by subtracting the applicant's countable income from the income standard for a one-person household.

The present action was initiated in July 1982 by Enrique Camacho and Leonarda Titone, two SSI-related medically needy Medicaid recipients, and Gladys Camacho, the ineligible spouse of Enrique Camacho, to challenge, *inter alia*, the State's proposed change in methodology. Plaintiffs obtained a temporary restraining order against implementation of the proposed

new methodology, and in or about November 1982, the State agreed not to implement the proposed change, and it adopted instead its present methodology. The claims of the original plaintiffs thereby became moot.

In December 1982 and January 1983, William Figueroa and Boyd, respectively, intervened, challenging one facet of the State's present methodology. Intervenors sued as representatives of a class, eventually certified by the district court as consisting of

all persons who have been since August 1, 1982, are, or may in the future be, applicants for or recipients of Medicaid in New York who are aged, or who are blind or disabled adults, whose spouses are neither aged, blind nor disabled, where the countable income of the non-aged, blind or disabled spouse is too low to be deemed available to the applicant or recipient under Supplemental Security Income regulations.

Intervenors contended that the present methodology's failure to exclude the ineligible spouse's income from the applicant's countable income when the spouse's income would be excluded in calculating SSI eligibility violated the federal statute's same-methodology requirement, and they sought a declaratory judgment to that effect. They sought to retain, however, that facet of the present methodology which uses the income standard for a household of two as the minuend in the Medicaid equation where the SSI methodology would use as its minuend the benefit rate for an individual. Thus, intervenors requested a judgment declaring "that income allowances for SSI-related Medicaid applicants and recipients must be based on the number of family members in a household and family members for whom they are legally responsible." They also requested, *inter alia*, an order requiring defendants to reimburse members of the class for unpaid Medicaid benefits that would have been payable if the methodology requested by intervenors had been used.

Recognizing that the State's new methodology deemed the ineligible spouse's pertinent income available to the applicant even when that income was so low that it would not be deemed available in determining SSI-eligibility, the district court granted intervenors' motion for a preliminary injunction against use of the "deeming" facet of the present methodology, enjoining the State from

a) Counting the income of a non-SSI-related spouse in determining the Medicaid eligibility of an SSI-related Medicaid applicant or recipient where the non-SSI-related spouse has countable income of $142.10 per month or less; ....

The court also granted intervenors' motion to prohibit the State from modifying the household-size facet of its present methodology, enjoining the State from

b) Changing current state policy by reducing income allowances for SSI-related Medicaid applicants and recipients to the one-person household level where a non-SSI-related spouse living with an SSI-related Medicaid applicant or recipient has countable income of $142.10 per month or less unless 60 days notice of such proposed change is given to counsel for plaintiffs herein....

Apparently agreeing that no material facts were in dispute, intervenors and all defendants subsequently moved for summary judgment. The court denied these motions from the bench, indicating that it found some merit and some flaws in intervenors' contentions:

I think the plaintiffs have a good argument that the deeming, which the state is doing, may very well be in violation of the federal law. I think as I indicated it's probably more restrictive than the federal law permits. The problem I have with the plaintiff's [sic] argument is I don't think the plaintiff [sic] may be entitled as a matter of federal law to be treated as a two person family when the federal regulations wouldn't treat him [sic] as a two person family.

Shortly thereafter, the court *sua sponte* ordered further argument on the summary judgment motions and thereupon decided to grant defendants' motions, stating as follows:

I was not satisfied that either the plaintiffs or the defendants were entitled to summary judgment, because they were both a little bit wrong. Upon further reflection and looking at that situation, I realized that the consequences of being a little bit wrong were different for plaintiffs than they were for defendants. If the plaintiffs go to trial and only prove one-half of what they have to prove, the plaintiffs cannot prevail.

Final judgment was entered dismissing intervenors' complaints. The court ordered, however, that the preliminary injunction continue in effect pending determination of intervenors' appeal to this Court.

## II. DISCUSSION

On this appeal, intervenors renew their contentions that the State is required to compute the Medicaid eligibility of the SSI-related medically needy who live with ineligible spouses by (1) excluding from consideration the income of such a spouse whose pertinent income is not more than one-half of the Federal benefit rate for an individual, and (2) subtracting the applicant's countable income from the income standard for a two-person household, regardless of whether the spouse's income is deemed available to the applicant. The first contention is an attack on the "deeming" aspect of the State's present, *i.e.,* preinjunction, methodology; the second seeks the continuation of the household-size aspect of the present methodology. We agree with intervenors' first contention, that the "deeming" aspect of the State's present methodology violates the same-methodology requirement set forth in 42 U.S.C. § 1396a(a)(10)(C)(i)(III); but we reject intervenors' second contention because the present methodology's household-size facet also violates the same-methodology requirement.

A. *The "Same Methodology" Requirement*

The State concedes that its present methodology for determining the Medicaid eligi-

bility of the SSI-related medically needy is not the same as the methodology used for determining SSI eligibility. It contends, however, that its formula does not violate § 1396a(a)(10)(C)(i)(III) because the use of its two-person household income standard (which is $159 higher than the standard for an individual) as minuend in the Medicaid eligibility equation more than offsets the inclusion of the ineligible spouse's income where that income is so low that it would not be deemed available using SSI methodology (a maximum of $142.10) as part of the equation's subtrahend, and overall, therefore, the State's methodology is more generous than the SSI methodology. Thus, the State argues that "[e]very SSI-related recipient ... is allowed to keep more income using the [State's] methodology than he would using the strict SSI methodology." Even assuming that the State's present methodology is always more generous than the SSI methodology, we reject this defense. While recent developments suggest that Congress may eventually enact measures to permit the states to use more generous methodologies (see Part II. A.3. below), neither the present statutory language nor the evolution of the section to its present form supports the notion that Congress intended to permit any exception to the same methodology requirement.

### 1. The Language of the Statute

Though the statutory scheme and the regulations construing it are of "unparalleled complexity," DeJesus v. Perales, 770 F.2d 316, 321 (2d Cir.1985), the language of § 1396a(a)(10)(C)(i)(III) itself, insofar as it describes the methodology to be used by a state for computation of Medicaid eligibility of the medically needy aged, blind, or disabled, appears to be relatively straightforward. It provides that

> the methodology to be employed in determining [income and resource] eligibility ... shall be the same methodology which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals....

There is no suggestion in the phrase "shall be the same methodology" that leeway is given to adopt a different methodology simply because it would be more generous than the SSI methodology.

The present language of § 1396a(a)(10)-(C)(i)(III) was introduced as part of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. No. 97–248, § 137(a)(8), 96 Stat. 324, 378, which became effective on September 3, 1982. Both the evolution of this language through 1982 and the central premises of Congress's programs to assist the needy belie the State's suggestion that Congress intended that this section not preclude a state's use of a methodology more generous than the SSI methodology.

### 2. The Legislative History

The Medicaid program was established in 1965 "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). Congress's fundamental premises in structuring programs to aid the needy were (1) that the supply of public funds to assist needy persons is not inexhaustible, and (2) that the primary concern of the states in providing financial assistance should be those persons who lack sufficient income to meet their basic needs—termed the categorically needy; those whose resources are sufficient to meet their basic needs but perhaps not to meet their medical expenses—termed the medically needy—have a lesser claim to public financial assistance. See, e.g., H.R.Rep. No. 213, 89th Cong., 1st Sess. 66 (1965) ("1965 House Report") ("[Categorically needy] people are the most needy in the country and it is appropriate for medical care costs to be met, first, for these people."); S.Rep. No. 404, 89th Cong., 1st Sess., Pt. 1, at 77 (1965) ("1965 Senate Report") ("It is only if [the categorically needy] group is provided for that States may include medical assistance to the less needy."), reprinted in 1965 U.S. Code Cong. & Ad.News 1943, 2017.

Several provisions were included in the Social Security Amendments of 1965 (the "Act"), Pub.L. No. 89–97, 79 Stat. 286, in order to ensure that the categorically needy receive first call on the limited supply of public funds for medical assistance. First, although any state that chooses to participate in the Medicaid program may elect not to provide Medicaid coverage to the medically needy, 42 U.S.C. § 1396a(a)(10)(C), it is required to provide Medicaid to the categorically needy, *id.* § 1396a(a)(10)(A)(i). Further, a state that elects to provide Medicaid to the medically needy may not provide more assistance to that group than to the categorically needy. Thus, 42 U.S.C. § 1396a(a)(10)(B)(ii) provides that "the medical assistance made available to [the categorically needy] ... shall not be less in amount, duration, or scope than the medical assistance made available to [medically needy] individuals...." Congress explained that "[t]his [provision] was included in order to make sure that the most needy in a State receive no less comprehensive care than those who are not as needy." 1965 House Report at 67; 1965 Senate Report at 77, *reprinted in* 1965 U.S.Code Cong. & Ad.News 2017.

Believing that then-existing programs which the Medicaid program was designed to replace were flawed in that they used cutoff points on income to determine an individual's financial eligibility, which could result in the denial of all aid to an individual who had enormous medical expenses but whose income was just above the cutoff level while assistance was granted to one whose medical expenses were small but whose income was just below that level, *see* 1965 House Report at 68; 1965 Senate Report at 78–79, *reprinted in* 1965 U.S.Code Cong. & Ad.News 2018–19; *see also* 111 Cong.Rec. 15,876 (July 8, 1965) (remarks of Sen. McNamara on Pub.L. No. 86–778, 74 Stat. 924 (1960)), Congress included in § 1902(a)(10)(B)(i) of the Act a provision that required states electing to provide Medicaid to the medically needy to determine the applicant's Medicaid eligiblity by using standards "comparable" to those used in determining eligibility for the relat-

ed cash assistance program. Thus, the state plan was required to provide

> for making medical or remedial care and services available to all individuals who would, if needy, be eligible for aid or assistance under any ... State [cash assistance] plan and who have insufficient (as determined in accordance with comparable standards) income and resources to meet the costs of necessary medical or remedial care and services....

Pub.L. No. 89–97, § 1902(a)(10)(B)(i), 79 Stat. 286, 345 (1965). The legislative history states that this provision

> require[d] States to take into account only such income and resources as ... are actually available to the applicant or recipient and as would not be disregarded ... in determining the eligibility for and the amount of the aid or assistance in the form of money payments for any such applicant or recipient under the title of the Social Security Act most appropriately applicable to him.

1965 Senate Report at 78, *reprinted in* 1965 U.S.Code Cong. & Ad.News 2018; 1965 House Report at 67.

The Act was amended at various times, and the SSI program was introduced as Title XVI of the Act effective January 1, 1974, Pub.L. No. 92–603, 86 Stat. 1465 (1972), to replace a variety of state programs for assistance to the aged, blind, or disabled. References to the SSI program were inserted into § 1902(a)(10), and the "comparable standards" language was retained, as state plans were required to provide

> for making medical assistance available to all individuals who would, except for income and resources, be eligible for aid or assistance under any ... State cash assistance plan or to have paid with respect to them supplemental security income benefits ... and who have insufficient (as determined in accordance with comparable standards) income and resources to meet the costs of necessary medical and remedial care and services....

Pub.L. No. 93–233, § 13(a)(3), 87 Stat. 947, 960 (1973).

The "comparable standards" language, which remained in the Act until 1981, was interpreted by both the Secretary and the courts to mean that a state was required to treat the various eligibility criteria in the same way that they were treated for the related cash assistance program. *See, e.g.,* 42 Fed.Reg. 2685 (1977) ("[A]ll aged, blind and disabled persons ... must have their eligibility determined using all SSI eligibility rules except for—and only except for—higher dollar amounts for income and resource eligiblity levels...."); *Caldwell v. Blum,* 621 F.2d 491, 495–98 (2d Cir.1980) (state's restrictions on transfer of assets by the medically needy impermissible where no such restriction was imposed on the categorically needy), *cert. denied,* 452 U.S. 909, 101 S.Ct. 3039, 69 L.Ed.2d 412 (1981); *Beltran v. Myers,* 701 F.2d 91, 94 (9th Cir.) (per curiam) (same), *cert. denied,* 462 U.S. 1134, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983); *Greklek v. Toia,* 565 F.2d 1259, 1261 n. 5 (2d Cir.1977) ("State's use of a dual system to determine Medicaid eligibility violates the core statutory and regulatory requirement that [AFDC recipients and the AFDC-related medically needy] be treated the same" with respect to allowable deductions from income), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3081, 57 L.Ed.2d 1128 (1978); *Friedman v. Berger,* 547 F.2d 724, 728 (2d Cir.1976) (income disregarded in determining SSI eligibility must likewise be disregarded in determining eligibility of SSI-related medically needy), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977).

In 1981, Congress passed the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Pub.L. No. 97–35, 95 Stat. 357, which substituted a less complex provision for what had been § 1902(a)(10)(C)(i) and thereby considerably confused matters. OBRA provided simply that state Medicaid plans for the medically needy were required to "include a description of ... the criteria for determining eligibility of individuals in the [medically needy] group for ... medical assistance." Pub.L. No. 97–35,

§ 2171(a)(3), 95 Stat. 807. The Secretary interpreted this change as authorizing the states to use, *inter alia,* methodologies for determining the Medicaid eligibility of the medically needy that differed from the methodology used to determine the financial eligibility of the categorically needy. Thus, regulations issued on September 30, 1981, stated as follows:

> Before the 1981 Amendments, the methodology for treatment of income and resources of the medically needy depended on the individuals' relationship to a specific cash assistance program. For example, the methodology for deeming the income of medically needy aged, blind, and disabled was taken from the SSI program. This was based on the former wording of section 1902(a)(10) of the Act that described the medically needy, in part, as individuals who "except for income and resources" would be eligible for cash assistance and for Medicaid as categorically needy....
>
> Section 2171 of the 1981 Amendments revised the Medicaid statute so that the direct linkage between the cash assistance programs and the medically needy is no longer explicit.... Therefore, we have concluded that the State need not adopt the methodology of a related cash assistance program in treating income and resources of the medically needy. Rather, the State may develop its own....

46 Fed.Reg. 47,976, 47,980 (1981).

Congress's reaction to this interpretation of its intent was swift, negative, and (at least temporarily) definitive. Within one week, Representative Henry Waxman, one of the framers of OBRA, stated that the new regulations purporting to "give States flexibility with respect to ... methodologies for determining income and resources" were "in direct conflict with both the medicaid statute as amended and the intent of the conferees in crafting those amendments," 127 Cong.Rec. 23,358 (1981). He emphasized that the matter of whether to change "methods for treating income or resources" had been expressly considered

and rejected. *Id.* Accordingly, to clarify its prior intent and to correct the Secretary's interpretation, Congress included in TEFRA the provision now codified at 42 U.S.C. § 1396a(a)(10)(C)(i)(III), which expressly states that the methodology to be used by the states "shall be the same methodology which would be employed under the" related cash assistance program. The House Report that accompanied the 1982 amendment stated that

This amendment makes clear that the Department had no authority to alter the rules that applied before September 30, 1981, with respect to medically needy income levels, medically needy resource standards, and the methodology for treating medically needy income and resources.

H.R.Rep. No. 757, 97th Cong., 2d Sess., Pt. 1, at 13 (1982).

Thus, whatever Congress may hereafter enact to alter § 1396a(a)(10)(C)(i)(III) (*see* Part II.A.3. below), we view the evolution of that section to its present form, which governs the rights of the parties to the present action, to be inconsistent with the State's contention that Congress intended to allow the states to use, in determining the Medicaid eligibility of medically needy aged, blind, or disabled persons, any methodology that is not the same as the methodology used in determining SSI eligibility. Congress apparently believed the pre-1982 law to require use by the states of the same eligibility methodology as was used in the related cash assistance program, and its insertion of the explicit "same methodology" language in § 1396a(a)(10)(C)(i)(III) in response to the Secretary's contrary inference as to the import of OBRA § 2171(a)(3) indicates that Congress did not intend to allow states to construct their own methodologies.

### 3. *The Subsequent Legislative Development*

In 1984, shortly before the end of the district court phase of this case, Congress passed the Deficit Reduction Act of 1984, which, *inter alia,* declared a 30-odd month moratorium on the Secretary's taking any action against a state "on account of [the state] plan's having a standard or methodology which the Secretary interprets as being less restrictive than the standard or methodology required under" 42 U.S.C. § 1396a(a)(10)(C)(i)(III). Pub.L. No. 98–369, § 2373(c)(1), 98 Stat. 1112 (July 18, 1984). The legislative history of this moratorium section suggests that Congress may not, after all, have thought that the pre-OBRA scheme required the states to use the same methodology as the related cash assistance program, and may not have intended TEFRA to limit the states, in determining Medicaid eligibility, to the use of the same methodology that would be used in the related cash assistance program:

Before OBRA, States could establish income or resource standards or methodologies for their medically needy programs that were, in some cases, less restrictive than those used in the related cash assistance programs.

. . . .

[TEFRA] amended the Medicaid statute to clarify that Congress did not intend to change the policies governing the income and resource standards and methodologies for determining eligibility of the medically needy from those in effect before OBRA. This amendment provided in part that the methodology to be used in determining income and resource eligibility for the medically needy must be the "same methodology" used under the relevant cash assistance program.

. . . [I]t is the understanding of the conferees that the Department has implemented this provision in an overly literal fashion, without taking into account the intent of the TEFRA clarification.

For example, the Department is treating certain income and resource rules as "methodology" that must strictly follow SSI or AFDC rules, even though all States with medically needy programs have traditionally been permitted to use less restrictive rules in certain areas. . . .

. . . .

... The conferees intend that, during the moratorium, the Secretary not proceed with the imposition of any sanctions, or otherwise suggest to the States that they must use more restrictive cash assistance standards and methodologies in their medically needy or other noncash recipient programs. States may use less restrictive standards and methodologies in their noncash programs, although they are still foreclosed from being more restrictive than the relevant cash assistance programs. It is the expectation of the conferees that the States will be reasonable in establishing less restrictive variations in the cash assistance methodologies and standards.

H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1366–68, *reprinted in* 1984 U.S.Code Cong. & Ad.News 2054–56.

The moratorium was enacted shortly before the district court entered judgment in the present case and was perforce not considered by the court. Even assuming that it would be proper to consider more definitive legislative changes made at the very end of a lawsuit such as this, we would nevertheless conclude that the moratorium provision of the 1984 legislation is too sketchy in detailing Congress's present thinking to be invoked to govern the rights of the parties here. The moratorium does not repeal the section at issue here or suspend its effectiveness except to forbid the Secretary from taking enforcement action. And although the Conference Report suggests that the states may after all be allowed to depart from the methodology of the related cash assistance program and fashion their own less restrictive methodologies for determining the Medicaid eligibility of the medically needy, nothing suggests that the states must do so. Nor is guidance provided for determining the extent to which a state will be permitted to deviate. Here, for example, the State argues that it should be permitted two deviations, one less restrictive and one more restrictive, because its overall methodology is less restrictive than the SSI methodology. The intervenors, in contrast, argue that each step of the methodology must be no more

restrictive than the corresponding step of the SSI methodology.

Congress imposed the moratorium, which may last as long as 30 months, on the Secretary's actions to enforce TEFRA "until the Congress has an opportunity to study and legislate on the matter." H.R. Conf.Rep. No. 861, 98th Cong., 2d Sess. 1367, *reprinted in* 1984 U.S.Code Cong. & Ad.News 2055. Until Congress has passed new legislation amending or rescinding § 1396a(a)(10)(C)(i)(III), we will apply that section as it was enacted.

### 4. *The State's Deviation*

■ Since we read the language and history of the current § 1396a(a)(10)(C)(i)(III) as forbidding the states to use any Medicaid eligibility methodology that would not be used in determining eligibility for the related cash assistance program, we see in that section no basis for inferring that Congress intended to allow more generous methodologies. Indeed, we would think that any unfettered leave to the states to use more generous Medicaid eligibility methodologies would be contrary to the central premises of the Medicaid and other federally funded public assistance programs. Assuming that the supply of public funds for medical assistance is limited, the more generous the State is to the medically needy, the fewer funds there are available for the categorically needy, who Congress has said must have priority.

■ As described in Part I.A.2. above, the State's present methodology for determining the Medicaid eligibility of the medically needy aged, blind, or disabled differs from the methodology used in determining SSI eligibility in three respects: (1) in deeming the pertinent income of the ineligible spouse available to the applicant even when that income is so low that SSI methodology would disregard it for SSI-eligibility purposes, (2) in subtracting the applicant's countable income from the medically needy income level for a household of two even where the spouse's income is not deemed available to the applicant, and (3) in

failing to choose as determinative of eligibility for Medicaid benefits the lesser of the amounts calculated with and without deeming. Notwithstanding that in overall effect the State's methodology may be more generous to SSI-related applicants for Medicaid than the SSI methodology would be, and notwithstanding intervenors' attempts to preserve the State's treatment of household-size, which is favorable to them (*see* Part II.A.5. below), we conclude that each of these facets of the State's present methodology violates § 1396a(a)(10(C)(i) (I–II) as it presently stands.

### 5. *The Household-Size Factor*

Intervenors have advanced a number of arguments to attempt to preserve in its present form the facet of the State's methodology for determining Medicaid eligibility that uses the income level for a household of two as the minuend of the equation even where the methodology for determining SSI eligibility would use as its minuend the Federal benefit rate for an individual. They argue, *inter alia*, (1) that we have no jurisdiction to declare that facet of the State's methodology unlawful because they have not challenged it and there thus is no case or controversy as to that facet, and (2) that that facet of the State's methodology is required by federal regulations that mandate the use of an income standard that is based on "family size" and is "uniform" for all individuals in a covered group. We have considered all of intervenors' arguments in support of the household-size facet of the State's present methodology and find merit in none of them.

 Intervenors' argument that there is no case or controversy with respect to the State's use of a two-person household income level when the ineligible spouse's pertinent income is not deemed available to the applicant is frivolous. The question of the validity of the State's use of a two-person household income level in these circumstances is properly before us if for no other reason than that intervenors have requested a judgment ordering the State to continue to use that level in calculating the class members' benefits. Intervenors' request was properly denied by the district court precisely because that facet of the State's present methodology violates the same-methodology requirement of § 1396a(a)(10)-(C)(i)(III).

Intervenors' more interesting argument focuses on 42 C.F.R. § 435.811, which provides in part that

> To determine eligibility of medically needy individuals, a Medicaid agency must use an income standard under this subpart that is—
>
> (a) Based on family size; [and]
>
> (b) Uniform for all individuals in a covered group;
>
> . . . .

Intervenors contend that this regulation requires the State, as part of its methodology whenever it calculates the Medicaid eligibility of an SSI-related applicant who lives with an ineligible spouse, to use the medically needy income level for a household of two as the minuend of its equation. We reject this argument because it confuses, in Medicaid terminology, the concepts of methodology and standard.

While neither "standard" nor "methodology" is a term that is defined in the Act, we infer that when Congress referred to "standard[s]" it had in mind such matters as the concrete criteria against which a given fact, such as the applicant's income, is to be compared. We infer that by "methodology" it meant to encompass such matters as the identification of relevant factors, the manner of treating or applying the relevant standards, and the manner of or procedure for setting or selecting the standards chosen. For example, the medically needy income level is a standard, *i.e.*, the criterion against which an applicant's countable income is compared; the determination of what amount of money constitutes that level is the setting of a standard. In contrast, the determination that "countable income" of an applicant should include the pertinent income of an ineligible spouse with whom the applicant lives unless the spouse's income is less than $142.10 establishes methodology because it identifies the

factors to be considered (*e.g.*, marital status and cohabitation) and governs the manner in which a standard ($142.10, as one half of the Federal benefit rate for an individual) is to be applied to one factor (the amount of the spouse's pertinent income). The equation

Benefit Level minus Countable Income = Amount of Benefits

is also an example of methodology because it governs the manner in which the benefit level (a standard) and the applicant's countable income (a defined fact) are to be treated. The decision that a medically needy applicant will first become eligible for Medicaid when, in a given period, his

Income minus Medical Expenses = Medically Needy Income Level

is likewise an example of a methodology because it controls the way in which two facts (the applicant's income and medical expenses) and a standard (medically needy income level) are to be treated.

Similarly, when standards have been set at varying levels for different circumstances, and two or more levels could be regarded as appropriate criteria in a given instance, the guidelines for selection between or among those levels is a methodology. For example, if an applicant would be eligible for assistance if his pertinent income were not more than $ X or if his gross income were not more than $ Y, the establishment of the values of X and Y would be the setting of standards; but the determination of whether the pertinent-income equation or the gross-income equation should be used would be a matter of methodology. In sum, we would normally regard questions of "whether" and "how" as matters of methodology; questions as to quantification, *e.g.*, "how much" or "how long," are matters of standards.

The analysis is complicated somewhat by the fact that the discretion of the states in setting the various standards to be used in determining Medicaid eligibility is not entirely unfettered, and a number of federal rules and regulations exist that direct the states to take specified factors into account in setting certain standards. These di-

rections too, as indicated above, are properly considered methodology. They are, however, methodology for setting standards, not methodology for determining eligibility. Section 1396a(a)(10)(C)(i)(III), in contrast, states that "the methodology to be employed *in determining ... eligibility ...* shall be the same methodology which would be employed under the supplemental security income program," (emphasis added); it does not purport to govern the methodology to be used in setting standards.

In terms of the issues in the present case, the requirement in 42 C.F.R. § 435.811 that a state consider "family size" in setting a medically needy income level appears to us merely to identify a factor that the State must take into account in fixing the amount of money that will constitute a medically needy income level. The regulation thus establishes a methodology for the setting of standards, and the State's decision as to what income level will be linked with a particular household size is the setting of a standard. The family-size regulation does not mean, however, that the medically needy income level for a household of two must be used as the minuend of the Medicaid eligibility equation whenever the applicant lives with an ineligible spouse, any more than it means that the State's established level for a household of four should be used when the SSI-related applicant has an ineligible spouse and two children. When circumstances indicate that the applicant could arguably be treated either as an individual or as a two-person household, the determination as to which treatment should be accorded, *i.e.*, whether the equation should use the individual income standard or the two-person income standard, is part of the methodology for determining eligibility.

In sum, 42 C.F.R. § 435.811 establishes methodology only for setting income standards and not methodology for determining eligibility. Thus, contrary to intervenors' contention, the regulation does not require the State to use as the minuend in its Medicaid eligibility equation the medically needy income level for a household of two

whenever the applicant lives with an ineligible spouse.

## B. *On Remand*

For the foregoing reasons, we conclude that intervenors' request for a declaration that the State is required to continue to use the two-person household income level in determining the Medicaid eligibility of the SSI-related medically needy even where SSI methodology would use a one-person standard was properly denied, and we affirm the judgment to that extent. The court should, however, have granted intervenors' request for declaratory and permanent injunctive relief against so much of the State's Medicaid plan as deems available to the SSI-related medically needy Medicaid applicant income of the ineligible spouse that would not be deemed available using SSI methodology. Accordingly, we remand for the granting of the latter relief.

We note that intervenors requested other forms of relief, including damages and attorneys' fees, which were not addressed by the court in light of its decision to grant summary judgment in favor of defendants. Those requests remain for consideration by the district court on remand.

We note also that the request that defendants reimburse members of the class for Medicaid benefits that would have been paid had the methodology urged by intervenors been used may require special attention. In light of our holding here that the State's methodology has been in part improperly parsimonious and in part improperly generous in its Medicaid eligibility determinations, it may be unclear whether members of the class have been overpaid or underpaid, and whether the interests of the medically needy members of the class are sufficiently similar to make the existing class certification appropriate. Finally, it appears to us that the class as certified below may inadvertently encompass even persons who are categorically needy. The final judgment should take care not to purport to interfere with the rights of the categorically needy to receive Medicaid.

## CONCLUSION

The judgment of the district court is affirmed in part and reversed in part, and the matter is remanded for further proceedings not inconsistent with this opinion. No costs.