Benjamin and Anna GREENSTEIN, by their next friend, Rose HOROWITZ, Barbara Bogsted, Sheldon and Hazel Greenberg, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Mary Jo BANE, Commissioner of the New York State Department of Social Services and Barbara Sabol, Administrator of the New York City Human Resources Administration, Donna E. Shalala, Secretary of Health and Human Services, Defendants.

No. 89 Civ. 1038 (RJW).

United States District Court, S.D. New York.

Oct. 5, 1993.

Toby Golick, Cardozo Bet Tzedek Legal Services, New York City (Francis N. Pantaleo, of counsel), Jeffrey Watnick, Legal Services for the Elderly in Queens, Rego Park (Donna Dougherty, of counsel), for plaintiffs.

Robert Abrams, Atty. Gen. of the State of NY, Robert F. Bacigalupi, Asst. Atty. Gen., New York City, for defendant Mary Jo Bane.

O. Peter Sherwood, Corp. Counsel, Georgia Pestana, Asst. Corp. Counsel, New York City, for defendant Barbara Sabol.

Mary Jo White, U.S. Atty., S.D.N.Y., Lorraine S. Novinski, Sp. Asst. U.S. Atty., New York City, for defendant Donna E. Shalala.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs are members of a certified class of "all New York City Medicaid recipients or their representatives who, as a result of agency error or delay, have incurred out-of-pocket expenses for authorized Medicaid services and have not been provided full reimbursement for those expenses." *Greenstein v. Perales,* No. 89 Civ. 1038 (RJW), 1989 WL 434395 at *14, 1989 U.S.Dist. LEXIS 6872 at **15–16 (S.D.N.Y. June 20, 1989). In this action brought pursuant to 42 U.S.C. § 1983, plaintiffs challenge the policies and practices of defendants Mary Jo Bane, Commissioner of the New York State Department of Social Services ("DSS"), Barbara Sabol, Administrator of the New York City Human Resources Administration ("HRA"), and Donna E. Shalala, Secretary of the United States Department of Health and Human Services ("HHS") (collectively the "defendants").[1]

In particular, plaintiffs allege that defendants misinterpret 42 C.F.R. § 431.246 (the "corrective action regulation") by adopting a policy of not providing full reimbursement for expenses incurred on account of erroneous denials and delays in Medicaid payments and by limiting corrective payments to a state's predetermined Medicaid rate. As a result, plaintiffs also question the validity

and constitutionality of N.Y.Comp.Codes R. & Regs. tit. xviii § 360–7.5(a)(1) (the "reimbursement regulation") which codifies defendants' reimbursement policy. Alternatively, plaintiffs argue that, even if the corrective action regulation does not provide for full reimbursement, the Court should invalidate the DSS and HRA practice of limiting reimbursement for personal home care services at the Medicaid rate, and should direct DSS and HRA to make additional reimbursements to plaintiffs.

Plaintiffs now move for an order granting summary judgment, pursuant to Rule 56, Fed.R.Civ.P. Both DSS and HRA cross-move for an order granting summary judgment in their favor. In addition, HRA argues that the action should be dismissed, because plaintiffs' claims are not enforceable under 42 U.S.C. § 1983. For the reasons that follow, plaintiffs' motion is granted and DSS and HRA's cross-motions are denied.

## BACKGROUND

### A. *Medicaid's Statutory Scheme*

#### 1. *The Medicaid Program*

■ Medicaid, enacted in 1965 as Title XIX of the Social Security Act, 79 Stat. 343 (codified as amended at 42 U.S.C. §§ 1396, 1396a–u (1988)), is a joint federal-state program providing medical assistance to eligible low-income individuals. States are not required to establish a Medicaid plan, but any plan they create must comply with the Medicaid statute and HHS regulations. 42 U.S.C. § 1396a; *see Himes v. Shalala,* 999 F.2d 684, 686 (2d Cir.1993). If the Health Care Financing Administration ("HCFA") of HHS approves the state's plan, the state is eligible to receive federal matching funds. *Sweeney v. Bane,* 996 F.2d 1384, 1385 (2d Cir.1993) (citing 42 U.S.C. § 1396).

States that institute Medicaid plans must furnish medical assistance to the "categorically needy." 42 U.S.C. § 1396a(a)(10)(A).

---

1. HHS was joined as a party to this litigation on March 7, 1990, when Louis Sullivan was Secretary of HHS. Since that time, Donna Shalala has succeeded Sullivan at HHS. Similarly, since this suit was filed, Barbara Sabol has succeeded William Grinker as Administrator at HRA and Mary Jo Bane succeeded Cesar Perales at DSS. Bane has recently resigned and has been temporarily replaced by Gregory Kaladjian.

The "categorically needy" are persons eligible for cash assistance through either of two programs: (1) Supplemental Security Income for the Aged, Blind and Disabled ("SSI"), 42 U.S.C. § 1381 *et seq.* or (2) Aid to Families with Dependent Children ("AFDC"), 42 U.S.C. § 601 *et seq. Atkins v. Rivera,* 477 U.S. 154, 157, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131 (1986). Because SSI and AFDC cover only assistance for basic necessities, Congress determined that recipients of those programs were especially deserving of medical assistance through Medicaid. *Id.* (citing *Schweiker v. Gray Panthers,* 453 U.S. 34, 37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460 (1981)).

In addition to the "categorically needy," a participating state may elect to provide medical benefits to the "medically needy." *Atkins v. Rivera,* 477 U.S. at 157, 106 S.Ct. at 2459. "Medically needy" persons are those who satisfy the eligibility requirements of SSI or AFDC but whose income or resources exceed the financial eligibility standards of those programs. *Id.* "Medically needy" persons only qualify for Medicaid benefits after they have engaged in "spend down" by incurring expenses that reduce their income to the eligibility level of a "categorically needy" person. *Id.* at 158, 106 S.Ct. at 2459 (citing 42 U.S.C. § 1396a(a)(17)).

While states must comply with all applicable federal requirements in implementing Medicaid, they have considerable discretion in the design and operation of their plans. "Within broad federal rules, each State decides eligible groups, types and range of services, and administrative and operating procedures." 42 C.F.R. § 430.0. In New York, DSS supervises the State's Medicaid plan while HRA administers the program in New York City. *See* N.Y. Social Services Law § 363–a(1). New York State has opted to provide medical benefits to the "medically needy" through a form of "step down" known as the "surplus income program." N.Y.Comp.Codes R. & Regs. tit. xviii §§ 360–4.8(b) and (c). Individuals in this program receive Medicaid coverage in any month in which they incur medical expenses exceeding an income allowance known as the "monthly surplus."

When a recipient becomes eligible for Medicaid, the program pays for approved medical supplies and services rendered *as of* the first day of the month in which eligibility was established. *Id.* § 360–2.4(c). The recipient is also deemed retroactively eligible for Medicaid on "expenses incurred during the three months prior to the month of application for Medicaid, provided the applicant was eligible in the month in which the medical care and services were received." *Id.* Retroactive payments for medical bills are made directly to the recipient, but reimbursement is limited to a fee established by the state known as the Medicaid rate. *Id.*

Generally, however, payments for Medicaid are made directly to the individual or entity *providing* the services rather than to the recipient of the services (the "vendor payment principle"). 42 C.F.R. § 447.10(d); N.Y.Comp.Codes R. & Regs. tit. xviii § 360–7.5(a). The purpose of the vendor payment principle is to ensure that providers will be reimbursed for services they furnish recipients, thereby eliminating disincentives in providing such services based on the fear of nonpayment. Here too, the provider obtains reimbursement at the state's predetermined "Medicaid rate." *See,* 42 U.S.C. § 1396a(a)(30)(A); 42 C.F.R. § 447.200 *et seq.* The Medicaid rate is not a single fee but a range of fees which varies depending on the type of services and supplies being provided. Once the provider has been paid by the state, the state is entitled to reimbursement from HCFA for a specified portion of payments referred to as the "federal financial participation" rate ("FFP").

### 2. *Personal Care Providers and Services*

New York State offers Medicaid to recipients who require medical attention in their own homes ("personal care services" or "home care"). These services are "rendered by an individual, not a member of the family, who is qualified to provide such services, where the services are prescribed by a physician...." N.Y. Social Services Law § 365–a(2)(e); N.Y.Comp.Codes R. & Regs. tit. xviii § 505.14(a)(1) (personal care services refer to "some or total assistance ... essential to the maintenance of the patient's health and safe-

ty in his or her own home"). The local social services districts determine whether an applicant is eligible to receive personal care services, and the level and amount of services eligible recipients should receive. N.Y.Comp.Codes R. & Regs. tit. xviii § 505.-24(a), (b). In New York City, HRA makes these determinations.

The number of hours provided through personal care services varies based on factors including the recipient's medical condition and whether he or she has family members or friends who can serve as informal caregivers. *Id.* § 505.14. Some recipients require "continuous twenty-four-hour personal" service in which they are provided with uninterrupted care by two personal care aides who serve consecutive twelve-hour shifts ("continuous care"). *Id.* § 505.14(a)(3). Other recipients may need "live-in" care in which there is only one personal care aide, who lives in the recipient's home. Finally, there are Medicaid recipients who need personal home care but for fewer hours than is provided by either continuous care or live-in care.

As with other Medicaid payments, personal care providers are paid for their services at the Medicaid rate. However, whereas the Medicaid rates for most supplies and services are explicitly established by local social services districts, the Medicaid rates for personal care services are negotiated by contract with personal care providers. N.Y.Comp. Codes R. & Regs. tit. § 505.14(c)(6). The local social services district contracts with personal care providers from one or more specified entities. These include: (1) not-for-profit or voluntary agencies ("voluntary providers"); (2) for-profit or proprietary agencies ("proprietary providers"); and (3) individual contractors not employed by an agency ("individual providers"). *Id.* § 505.-14(d)(2).

### B. *Corrective Payments Under Medicaid*

#### 1. *Corrective Payments Regulations*

Individuals, whose claims for medical assistance are denied or not acted upon with reasonable promptness, are entitled to a "fair hearing" before the state agency supervising the Medicaid program. 42 U.S.C. § 1396a(a)(3). If the agency decides in favor of the applicant, it must make corrective payments retroactive to the date of the incorrect determination, pursuant to the federal corrective action regulation. 42 C.F.R. § 431.246. This regulation reads in full:

The agency must promptly make corrective payments, retroactive to the date an incorrect action was taken, if—

(a) The hearing decision is favorable to the applicant or recipient; or

(b) The agency decides in the applicant's or recipients favor before the hearing.

*Id.*

Although the federal corrective action regulation itself does not define its scope, New York has its own regulation, known as the reimbursement regulation, which specifies to whom and how much payments should be made for erroneous denials. The reimbursement regulation states in relevant part:

(a) Payment for medical care provided under the MA program will be made to the person or institution supplying the care. *However, payment for services or care may be made, at the MA rate or fee in effect at the time such services or care were provided,* to the following:

(1) *a recipient* or his/her representative *when an erroneous determination by the social services district of ineligibility is reversed.* The erroneous decision must have caused the recipient or his/her representative to pay for medical services which should have been paid under MA. Direct reimbursement to the recipient or the recipient's representative will be made whether the decision to reverse is due to the district discovering its own error, or as the result of a fair hearing decision or court order.

N.Y.Comp.Codes R. & Regs. tit. xviii § 360–7.5(a)(1) (emphasis added). In New York, payments for erroneous denials are made directly to recipients but payments are limited to the State's applicable Medicaid rate.

Based on the reimbursement regulation, HRA and DSS have both issued directives setting payment at the Medicaid rate as a condition for reimbursing individuals who have incurred out-of-pocket expenses for

medical services due to agency error. *See, e.g.,* The New York State Fiscal Reference Manual for Local Social Service Districts, Procedures for Medical Assistance Payments/Reimbursement vol. I, ch. 7 at 30 ("Payment/reimbursement shall not exceed the rate or fee allowed by Medical Assistance at the time the service was rendered."). Plaintiff's Rule 3(g) Statement Ex D.

### 2. *Reimbursement for Personal Care Services*

N.Y.Comp.Codes R. & Regs. § 505.14(h) sets forth the manner in which DSS determines Medicaid rates for personal care providers.[2] In general, DSS selects the lower of the providers' charge to the public for personal care services and a payment rate determined by DSS for each provider. *Id.* § 505.-14(h)(7).[3] Local social services districts may request exemptions from DSS and substitute their own methodologies in determining Medicaid rates for personal care services. *Id.* HRA has developed a methodology for New York City whereby each provider submits fiscal and statistical data representing its cost of doing business. Berberich Aff. ¶ 31.[4] Through this data, HRA calculates a unique rate for each personal care provider. *Id.* The HRA methodology also provides for the calculation of a "weighted average." The weighted average is determined by calculat-

ing the average cost of providing one hour of home care services in New York City.[5]

When HRA determines that a Medicaid recipient is eligible for reimbursement, DSS calculates the amount of corrective payment depending on which personal care provider was used. For recipients receiving personal care from voluntary or proprietary providers that contract directly with HRA ("contract providers"), DSS authorizes HRA to reimburse the recipient at the rate specified in the contract. Recipients who purchase personal care services from a voluntary or proprietary provider that does not have a contract with HRA ("non-contract providers") are reimbursed at the weighted average. Finally, when recipients secure personal care from an individual provider, HRA reimburses the recipient at the rate the individual provider would have been paid had it been employed by a voluntary or proprietary provider.

With respect to individual providers, HRA currently uses the minimum wage as the reimbursement rate because that is the rate at which HRA pays most individual providers with which it has contracts. If these services were, however, provided to a couple rather than an individual, HRA reimburses at the minimum wage plus fifty cents (the "mutual rate"). According to HRA, the minimum wage or mutual rate are used in these cir-

**2.** § 505.14(h) was amended on February 24, 1993. In general, the amendment revised the manner in which Medicaid rates are determined for voluntary and proprietary providers. The amendment did not revise the manner in which Medicaid rates are determined for individual providers.

**3.** DSS determines a provider's payment rate based on a cost report the provider submits. This report includes personnel and nonpersonnel operating costs. However, DSS only considers the provider's operating costs that are allowable costs. These are costs that are necessary for the provider's operation, are related to the recipient's care, and are not expressly declared nonallowable by federal or state regulations. Allowable costs are determined in accordance with reimbursement principles developed for determining payments under Medicare. Moreover, DSS limits payment for the provider's administrative and general expenses, other than capital costs, at a rate that does not exceed twenty eight percent of the provider's total allowable costs. Finally, DSS adjusts the provider's total allowable costs by a trend factor that designates an

external price indicator for each of the three components that comprise the total costs of personal care services. The three components are: (1) an aide, wage and benefit components; (2) an administrative and operating component; and (3) a clinical component. *See* N.Y.Comp.Codes & Regs. tit xviii § 505.14(h)(7)(ii)(a)(2).

**4.** Barry T. Berberich is the Assistant Commissioner of the Bureau of Long Term Care in the Division of Health and Long Term Care of DSS. The Bureau is responsible for establishing policies governing the provision of personal care services.

**5.** For example if one provider offers 10,000 hours of home care per year at a contract rate of $10 per hour for a total of $100,000 and a second provides 200 hours of home care at a contract rate of $13 per hour or $2600, the total cost of providing 10,200 hours is $102,600. Therefore, the weighted average for these two providers would be $10.05 per hour.

cumstances, because the individual providing the services has no administrative costs, is neither regulated nor supervised and has not received the required training for personal care services.

HRA has contractual arrangements for the provision of personal care with seventy-four voluntary providers, five proprietary providers, and one hundred individual providers. Berberich Aff. ¶ 27. Most of the voluntary providers HRA contracts with serve only Medicaid recipients. Voluntary providers with whom HRA has contracts, generally, service at least 200 recipients. However, some providers may serve as many as 1,000 recipients. *Id.* ¶ 29. By serving a large Medicaid caseload, these providers often benefit from the economies of scale that reduce their cost of doing business. For example, the administrative costs of voluntary providers serving groups of Medicaid recipients will be less than providers that serve no Medicaid recipients.

### C. *The Representative Plaintiffs*

#### 1. *Benjamin and Anna Greenstein*

Benjamin and Anna Greenstein are an elderly couple suffering from Parkinson's disease and Alzheimer's disease respectively. Through the Medicaid program, the Greensteins were first provided with twelve hours of daily home care, which was later increased to twenty-four hours of live-in service. The Greenstein's physician requested that the personal home care services be increased to continuous service provided in two daily shifts, and an HRA social assessment concluded that the request be granted. After HRA did not issue a determination or provide any additional care, the Greensteins filed an order to show cause on October 20, 1988 seeking an order increasing their home care services. At the same time, the Greenstein's received emergency funding from a charitable organization with the understanding that they would seek full reimbursement for all sums expended. Plaintiffs' Rule 3(g) statement ¶¶ 81–91.

The Greensteins were incapable of obtaining home-care from a Medicaid provider because it would not accept private-pay clients. After inquiring with a number of providers, the Greensteins finally used a provider that offered the lowest rate of all at $12.75 per hour or $153 for each twelve hour shift. On November 4, 1988, the State Supreme Court granted the Greenstein's motion, pending a decision to be rendered after a state fair hearing conducted by DSS. *Id.* at ¶¶ 92–93.

The state fair hearing held on December 22, 1988 resulted in a favorable decision for the Greensteins. In the decision, DSS directed HRA to provide reimbursement for monies expended in providing a twelve hour shift for the period from October 21, 1988 to November 3, 1988 at a rate up to the Medical Assistance rate or fee at the time the services were rendered. As a result, although the Greensteins needed to pay $12.50 an hour to obtain services, reimbursement was limited to $6.50 an hour, the applicable rate at the time. *Id.* at ¶ 94.

#### 2. *Barbara Bogsted*

Barbara Bogsted alleges that her mother, Elizabeth Henderson, required home care services beginning with her discharge from a hospital on December 13, 1985, but that such services were not authorized by HRA until February 13, 1986. Bogsted paid $1,840 for services provided by a provider to her mother for the period from December 13, 1985 through January 3, 1986.[6] HRA initially refused to reimburse Bogsted, but after a fair hearing held on December 30, 1986, DSS determined that HRA: (1) was wrong in refusing to reimburse Bogsted; (2) improperly delayed authorizing Medicaid services to Henderson; and (3) should have authorized personal care services from December 19, 1985. DSS directed HRA to afford Bogsted the opportunity to submit verification of payments for private home care services from December 19, 1985 to February 21, 1986, and to reimburse Bogsted for expenditures in accordance with the Medicaid rate with an

---

**6.** Although the provider continued to provide Henderson with services for the period from January 4, 1986 through February 21, 1986, it

did not receive payment until after the request for Medicaid authorization was acted upon by HRA.

adjustment for the required surplus contribution. *Id.* at ¶¶ 95–100.

On April 27, 1987, HRA reimbursed Bogsted in the amount of $558.69 in out-of-pocket expenses for home care provided to Henderson between December 19, 1985 and January 3, 1986. The amount represented a rate of $3.35 per hour, for twelve hours a day for a total of $40.20 per day. HRA subtracted Henderson's monthly surplus contribution for this period amounting to $84.51. *Id.* at ¶ 101. Bogsted then requested a second fair hearing, and DSS issued a decision on December 18, 1987 holding that HRA was correct in limiting Bogsted's reimbursement to twelve hours per day of home care. However, DSS directed HRA to: (1) reevaluate the rate of payment and (2) recalculate the surplus income deduction. In a corrected fair hearing decision of May 9, 1988, DSS corrected an error in computation with respect to the surplus deduction but left the rest of the earlier fair hearing decision intact. *Id.* at ¶ 102. Based on these determinations, Bogsted alleges that she has been reimbursed for only $574.79 of the $1874 in payments she paid from her own funds for home care erroneously denied her mother by Medicaid. *Id.* at ¶¶ 103–05.

### 3. *Sheldon and Hazel Greenberg*

Sheldon and Hazel Greenberg allege that they should be reimbursed in full for home care services they provided to Lillian Cohen, Mrs. Greenberg's mother, for the period from September 15, 1986 through February 3, 1987. After being discharged from the hospital on September 15, 1986, Cohen required home care assistance. She had applied for Medicaid and was approved on October 3, 1986 for twenty-four hour per day home care service on a sleep-in basis. Although Cohen was financially eligible to receive Medicaid as of November 1, 1986, HRA never provided the services to her. Instead, her daughter and son-in-law paid a provider $360 per week for the sleep-in home care services. On March 6, 1987 Cohen died from colon cancer. *Id.* at ¶¶ 106–13.

The Greenbergs allege that they spent $4834.26 for home care services for Cohen between November 1, 1986 and February 2, 1987. After a fair hearing held on March 4, 1987, DSS issued a decision dated July 9, 1987 in which it determined that HRA should provide reimbursement for home care services on a twenty-four hour per day, seven days per week, sleep-in basis for the period in question at the Medicaid rate. Therefore, HRA agreed to reimburse the Greenbergs for $3,310.80 for the home care services they provided Cohen from November 1, 1986 through February 2, 1987. This amount represented reimbursement at a rate of $3.35 per hour for twelve hours per day for a total daily rate of $40.20. HRA deducted $468 representing Cohen's monthly surplus income for the period in question. *Id.* at ¶¶ 114–16.

At the Greenberg's request, a second fair hearing was held on January 14, 1988 and resulted in a decision issued on February 22, 1988 directing HRA to explain its method of computation of the reimbursement amount and specifically the number of hours paid daily for sleep-in personnel care services and the dollar per hour. *Id.* at ¶ 118. On May 19, 1988, HRA explained in a letter to DSS that agencies under contract with HRA to provide home care to Medicaid recipients only receive payment for twelve hours of services per day in sleep-in cases. When a recipient contracts with an independent contractor, the letter continues, HRA reimburses the recipient at a $3.35 per hour rate. Based on this information, DSS concluded that HRA's reimbursement to the Greenbergs complied with the fair hearing decision. *Id.* at ¶¶ 120–21.

### DISCUSSION

Summary Judgment may be granted when the moving party establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ. P.; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991). In this action, there is no dispute as to the material facts.

At issue in this case is the proper construction of the corrective action regulation. Plaintiffs derive two inferences regarding the

method and scope of corrective payments based on this regulation. First, according to plaintiffs, the corrective action regulation embodies an exception to the vendor payment principle. In other words, the regulation permits corrective. payments, unlike most Medicaid payments, to be made *directly* to Medicaid recipients. Second, plaintiffs interpret the phrase "corrective payments," based on the structure and purpose of the Medicaid Act, to mean payments sufficient to correct agency errors. Therefore, plaintiffs assert that, in order to make the recipients whole, corrective payments should not be limited to the Medicaid rate but should entail full reimbursement.

Defendants contend that both of plaintiffs' inferences are unfounded. They argue that, insofar as the corrective action regulation fails to specify the recipient of corrective payments, the regulation must comply with Medicaid's general statutory requirement that payments be made to providers rather than recipients. In support of their interpretation, defendants point out that Congress expressly enumerated its only exception to the vendor payment principle in 42 U.S.C. § 1396d(a).[7] To interpret "corrective payments" in a way that construes the corrective action regulation as another statutory exception to the vendor payment principle would be violative of sovereign immunity.

Likewise, defendants argue that the regulation's silence concerning the amount of payments confirms that it adheres to Medicaid's statutory fee schedule authorizing payments only at the Medicaid rate. In the alternative, defendants maintain that even if the corrective action regulation constitutes a waiver of the vendor payment principle and authorizes direct payment to Medicaid recipients, there is still no basis for concluding that payments should exceed the Medicaid rate.

7. This provision explicitly permits states to authorize direct payments to recipients' physicians or dentists. New York has not elected this option.

8. 42 U.S.C. § 1983 provides in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected,

### I.

#### *Claims under 42 U.S.C. § 1983*

Before addressing the meaning and scope of the corrective action regulation, the Court considers HRA's allegation that plaintiffs are barred from bringing their claims under 42 U.S.C. § 1983. Section 1983 establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2516, 110 L.Ed.2d 455 (1990) (quoting 42 U.S.C. § 1983).[8] It serves to remedy violations of federal statutes as well as the Constitution. *Id.* (citing *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980)). There is a presumption in favor of the right to bring suit under § 1983. *Chan v. City of New York,* 1 F.3d 96, 103 (2d Cir.1993).

However, a violation of a federal statute does not always give rise to a cause of action under § 1983. *Id.* When alleging a violation of a federal statute, a plaintiff is not allowed to sue under § 1983 if: (1) "the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983;" or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself." *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987).

#### A. .Enforceable Rights

##### 1. *The Existing Framework*

In determining whether a statute creates a right, privilege or immunity enforceable under § 1983, the Court applies the three-part *Wilder* test. First, the Court ascertains whether " 'the provision in question was intended to benefit the putative plaintiff.' " *Wilder v. Virginia Hosp. Ass'n,* 496

any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

U.S. at 509, 110 S.Ct. at 2517 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989)). Second, even if the provision benefits the plaintiff, the Court can still hold that it does not create an enforceable right if "it reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit." *Id.* (citing *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981)). Third, the Court will also not enforce plaintiff's asserted interest, if it "is 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.' " *Id.* (quoting *Golden State transit Corp. v. City of Los Angeles*, 493 U.S. at 108, 110 S.Ct. at 449; *Wright v. Roanoke Redevelopment and Housing Auth.*, 479 U.S. at 431–32, 107 S.Ct. at 774–75).

In *Wilder*, the Supreme Court held that the Boren Amendment to the Medicaid Act created a right enforceable by health care providers under § 1983 to obtain "reasonable" reimbursement rates. *Id.* 496 U.S. at 509–10, 110 S.Ct. at 2517–18. The Court reasoned that "[t]here can be little doubt that the health care providers are the intended beneficiaries of the Boren Amendment. The provision establishes a system of reimbursement of providers and is phrased in terms benefitting health care providers . . . ." *Id.* at 510, 110 S.Ct. at 2517–18. The Boren Amendment, *Wilder* explained, "imposes a binding obligation on States participating in the Medicaid program to adopt reasonable and adequate rates" because it "is cast in mandatory rather than precatory terms: The State plan *'must'* 'provide for payment . . . of hospital[s].' " *Id.* at 512, 110 S.Ct. at 2518–19 (emphasis in original) (quoting 42 U.S.C. § 1396a(a)(13)(A)). " 'The Boren Amendment's language succinctly sets forth a congressional command, which is wholly uncharacteristic of a mere suggestion or nudge.' " *Id.* (quoting *West Virginia Uni-*

versity Hospitals, Inc. v. Casey*, 885 F.2d 11, 20 (3d Cir.1989)). Finally, *Wilder* found that the obligation was not "too 'vague and amorphous' " inasmuch as "the statute and regulation set out factors which a state must consider in adopting its rates." *Id.* 496 U.S. at 519, 110 S.Ct. at 2522.

More recently, in *Suter v. Artist M.*, ⸺ U.S. ⸺, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Supreme Court did not explicitly apply the three-part *Wilder* test, but established certain guidelines to determine whether a § 1983 right of action exists.[9] *Suter* found that children who were state wards had no right to maintain a § 1983 action to enforce a federal statute that conditioned federal reimbursement for state foster care programs on HHS acceptance of a state plan containing a provision that " 'reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home . . . .' " *Id.* at ⸺, 112 S.Ct. at 1364 (quoting 42 U.S.C. § 671(a)(15)). There was no statutory right to maintain a § 1983 action because: (1) "no further statutory guidance is found as to how 'reasonable efforts' are to be measured," *Id.* at ⸺, 112 S.Ct. at 1368; (2) the method of compliance was, "within broad limits, left up to the state," *Id.;* and (3) the statute provides other enforcement mechanisms and, therefore, the absence of a private remedy under § 1983 did not render the "reasonable efforts" clause ineffectual. *Id.* at ⸺ – ⸺, 112 S.Ct. at 1368–69. In conclusion, *Suter* stated:

> Careful examination of the language relied upon by respondents, in the context of the entire Act, leads us to conclude that the "reasonable efforts" language does not *unambiguously confer* an enforceable right upon the Act's beneficiaries. The term "reasonable efforts" in this context is at least as plausibly read to impose only a

---

**9.** As this Court recently explained, "the jurisprudence concerning whether a given statute creates a right, privilege or immunity under § 1983 is in a state of flux." *Chan v. City of New York*, 803 F.Supp. 710, 721 (S.D.N.Y.1992), *aff'd*, 1 F.3d 96 (2d Cir.1993). In *Suter v. Artist M.*, ⸺ U.S. ⸺, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the

Supreme Court did not explicitly apply the *Wilder* framework, but it did not overrule *Wilder* either. Therefore, as in *Chan*, "this Court will apply the *Wilder* framework, with the modifications suggested by *Suter*," to determine whether a right has been created under § 1983. *Chan v. City of New York*, 803 F.Supp. at 721.

rather *generalized duty* on the State, to be enforced not by private individuals, but by the Secretary....

*Id.* at ——, 112 S.Ct. at 1370.

### 2. The Existing Framework as Applied to the Corrective Action Regulation

■ Applying the three-part *Wilder* test, and following the guidelines set out in *Suter,* this Court finds that plaintiffs have an enforceable right under § 1983. First, Medicaid recipients are the intended beneficiaries of the corrective action regulation. Medicaid, in general, aims to benefit its recipients whose income and resources are insufficient to meet the costs of necessary medical services. More specifically, the corrective action regulation provides a remedy to those recipients who have been declared eligible for corrective payments pursuant to the fair hearing provision. Defendants' argument that the corrective action regulation does not unambiguously confer a binding obligation to make *direct* payments to recipients who incurred costs as a result of agency error is beside the point. Whether or not payments are to be made directly to the recipients, it is they who benefit from the corrective action regulation.

Second, participating states are bound by the regulation to make corrective payments promptly. "Once a State voluntarily chooses to participate in Medicaid, the State must comply with the requirements of Title XIX and applicable regulations." *Alexander v. Choate,* 469 U.S. 287, 289 n. 1, 105 S.Ct. 712, 714 n. 1, 83 L.Ed.2d 661 (1985). Indeed, the regulation itself is not phrased in precatory but in mandatory terms—"the agency *must* promptly make corrective payments." Moreover, the statutory provisions upon which plaintiffs rely are similarly phrased in mandatory language. For example, plaintiffs bring this action under a provision of the Medicaid statute requiring that "medical assistance made available to any individual ... *shall* not be less in amount duration or scope than ... to any other such individual." 42 U.S.C. § 1396a(a)(10)(B) (emphasis added). Although states have discretion in the design of their plans, they are not granted "broad limits" in complying with the corrective action regulation; corrective payments must be made "promptly."

Third, plaintiffs asserted interest is not too vague and amorphous that it is beyond the competence of the judiciary to enforce. Unlike in *Suter,* the right plaintiffs seek to claim under is not limited to "reasonable efforts." Plaintiffs seek their out-of-pocket expenditures, a definite and precise mathematical amount in the form of "corrective payments[ made] retroactive to the date an incorrect action was taken." Thus, plaintiffs have met the three-part *Wilder* test and have an enforceable right within the meaning of 42 U.S.C. § 1983 to bring a claim under the Medicaid statute.

### B. Congressional Foreclosure

### 1. The Existing Framework

■ Even where there is a clearly conferred federal right, a § 1983 suit is not available where Congress has expressed its intention to foreclose such a remedy. Yet, courts should not "lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right.'" *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. at 520, 110 S.Ct. at 2523 (quoting *Wright v. Roanoke Redevelopment & Housing Auth.,* 479 U.S. at 423–24, 107 S.Ct. at 770 (quoting *Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984))).

■ Indeed, defendants have a heavy burden to demonstrate "'by express provision or other specific evidence from the statute itself'" that Congress intended to foreclose private enforcement. *Id.* 496 U.S. at 520–21, 110 S.Ct. at 2523 (quoting *Wright v. Roanoke,* 479 U.S. at 423, 107 S.Ct. at 770). "Other specific evidence" may include the provision of a scheme of remedial devices that is "'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.'" *Id.* (quoting *Middlesex County Sewage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981)). However, "[t]he availability of administrative mechanisms to protect plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose

a § 1983 remedy. Rather the statutory framework must be such that 'allowing a plaintiff' to bring a § 1983 action 'would be inconsistent with Congress' carefully tailored scheme.' " *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. at 106–07, 110 S.Ct. at 448–49 (citations omitted). As this Court recently noted, the "sufficiently comprehensive" test has rarely been met. *Chan v. City of New York,* 803 F.Supp. 710, 726 (S.D.N.Y.1992), *aff'd,* 1 F.3d 96 (2d Cir.1993).

### 2. *The Existing Framework as Applied to the Corrective Action Regulation*

■ Defendants argue that plaintiffs are foreclosed from suing under § 1983, because they may challenge reimbursement decisions at an administrative "fair hearing" that provides a remedy amounting to a "comprehensive enforcement mechanism." This Court disagrees. In *Wilder,* the Court explicitly found that the administrative scheme established pursuant to the Boren Amendment to the Medicaid Act could not be considered sufficiently comprehensive to demonstrate a congressional intent to preclude § 1983 relief. Likewise, in this action, the right to a fair hearing does not furnish plaintiffs with an elaborate and comprehensive enforcement mechanism. The fair hearing does not provide for class-wide relief. In addition, the fair hearing cannot reimburse recipients for actual costs incurred as a result of agency error because New York's reimbursement regulation is directly to the contrary.

■ Defendants' argument that New York allows its fair hearing decisions to be challenged through an Article 78 proceeding is similarly misplaced. "The availability of state administrative procedures ... does not foreclose resort to § 1983." *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. at 523, 110 S.Ct. at 2524. Moreover, § 1983 relief is not foreclosed by the failure to exhaust state administrative and judicial remedies. *See Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961) ("The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked."). Therefore, defendants have failed to meet their burden of demonstrating that Congress has foreclosed plaintiffs from bringing a § 1983 action.

### II.

#### *Corrective Payments: To Whom?*

The Court must now determine whether the corrective action regulation is an exception to the vendor payment principle. Although the federal regulation does not specify to whom payments should be made, New York's reimbursement regulation codifies defendants' policy of offering direct reimbursement to recipients who have incurred expenses as a result of agency error. This policy originated in an October 15, 1980 memorandum, issued by HCFA's Director of Bureau Program Policy, Robert D. O'Connor, outlining when Medicaid payments can be made directly to recipients as an exception to the vendor payment principle (the "O'Connor memo"). Plaintiff's 3(g) Statement Ex H. The O'Connor memo was written during the pendency of a federal class action, *Chenet v. Department of Public Welfare et al.,* Civ. No. 78–848–F (D.Mass.), in which the issue arose whether retroactive payments may be made directly to recipients, who were improperly denied Medicaid benefits. It announced that:

> Upon review of this issue, we have determined that *States may make direct reimbursement to individuals who paid for services after an erroneous determination of ineligibility, which is reversed on appeal. The purpose of this exception to the vendor payment principle* is to correct the inequitable situation that results from the erroneous determination made by the agency. The intent is to put individuals who acquire eligibility on appeal on the same basis as those whose eligibility was correctly determined in the first place.

Plaintiffs' 3(g) Statement Ex. H (emphasis added). As a consequence of the O'Connor memo, defendants refer to the policy of making payments for erroneous denials directly to recipients as the *Chenet* exception to the vendor payment principle.

Moreover, the HCFA State Manual (the "State Manual"), which instructs states on how to provide corrective payments for erro-

neous denials, describes these payments as an exception to the vendor payment principle. HCFA explains that it is a "longstanding HCFA policy [to] make *direct* reimbursement available to all individuals who pay for medical services between the date of an erroneous determination of ineligibility for Medicaid and the date the determination is reversed." State Manual § 6320 (emphasis added). In authorizing states to directly reimburse recipients for erroneous denials, the State Manual identifies this policy as an exception to the vendor payment principle. It notes: *"The policy of direct reimbursement is an exception to the vendor payment principle.... It was adopted in response to litigation on behalf of individuals who paid for covered medical services pending a reversal of an unfavorable determination." Id.* § 6320.1 (emphasis added).

■ In this litigation, defendants have characterized the *Chenet* exception simply as a creation of the O'Connor memo. They maintain that the corrective action regulation should not be interpreted as a waiver of the vendor payment principle. Indeed, defendants emphasize that the O'Connor memo specifically restricted the ambit of the *Chenet* exception. The O'Connor memo stated: "payments for ... these individuals should not be more liberal than for other Medicaid recipients. Therefore, under the exception, direct reimbursement may only be made available for bills paid after the date of an erroneous determination." Plaintiffs' 3(g) Statement Ex. H. Yet, at the same time, defendants assert that the State Manual contains binding instructions regarding the Medicaid program. They request that the Court rely on the State Manual in interpreting the corrective action regulation, inasmuch as the manual's " *'[i]nstructions are official inter-*

*pretations of the law and regulations....' "* Letter from Lorraine S. Novinski, Special Assistant United States Attorney, to Judge Robert J. Ward (August 20, 1993) (quoting State Manual, Foreword § B 1). Absent explicit authorization by HHS to the contrary, this Court is bound to consider HCFA's policy of direct reimbursement for an erroneous agency determination as the official interpretation of the corrective action regulation.[10] Therefore, this Court finds that the corrective action regulation is an exception to the vendor payment principle.

■ This Court also finds it reasonable to construe the corrective action regulation as an exception to the vendor payment principle. While the vendor payment principle serves to promote provider participation in Medicaid, corrective payments made directly to recipients in no way hinders this objective. When Medicaid needs to make corrective payments, the provider has already been paid; it is only the recipient who requires reimbursement. Akin to the rationale justifying the vendor payment principle, if corrective payments were not made directly to the recipient, there would be no guarantee that he or she would actually be reimbursed for their payments. Therefore, this Court finds that not only is the corrective action regulation an exception to the vendor payment principle but direct payment in the corrective payment context is wholly consistent with the objectives of the vendor payment principle.

### III.

*Corrective Payments: How Much?*

The more difficult question is whether the corrective action regulation should limit corrective payments to the Medicaid rate. Restricting the amount of corrective payments

---

10. Defendants appear to be arguing that, while the *Chenet* exception includes payments for erroneous denials, it should not be construed as an interpretation of the seemingly broader category of "corrective payments" under the corrective action regulation. They assert that the *Chenet* exception does not authorize direct reimbursement for expenses incurred as a result of agency delay. However, there is little, if any, difference between "corrective payments" and "payments for erroneous denials." Indeed, the State Manual section explaining how to make payments for

erroneous denials is entitled "Direct Reimbursement by States to Medicaid Recipients to *Correct* Erroneous Denials." State Manual § 6320 (emphasis added). Corrective payments are, essentially, what are needed to rectify an erroneous agency determination. Whether the agency has actually made a mistake by improperly denying assistance to a recipient or whether the agency delays assistance to one who is rightfully qualified for Medicaid, the aggrieved Medicaid beneficiary will have incurred expenses that need to be reimbursed.

clearly represents defendants' official reimbursement policy and is codified in New York's reimbursement regulation. In fact, it originated in the O'Connor memo as a qualification to the *Chenet* exception. The O'Connor memo declared: "This provision establishes a limited exception to the vendor payment principle.... Direct reimbursement will be available only at the level of the State's fee schedule, even though the individual may have paid more." Plaintiffs' 3(g) Statement Ex. H. The policy also appears in the State Manual which instructs: "FFP is available in state payments to individuals for direct reimbursement for corrective payment only if ... Payment is made at the level of your fee schedule or the upper limit as specified in the State plan for the services in question ... even though the individual may have paid more." State Plan § 6320.3.

Plaintiffs seek to invalidate this policy, however, by alleging that it violates the Medicaid statute as well as the equal protection and due process clauses of the Fourteenth Amendment. Defendants counter that the Court is bound to uphold the policy on account of judicial deference to agency action, and that, in any case, the policy does not contravene either the Medicaid statute or the Constitution. The Court considers first whether it must defer to the agency's interpretation and then addresses the statutory and constitutional claims.[11]

### A. *Judicial Review of Agency Action*

#### 1. *Judicial Deference*

 Pursuant to the Administrative Procedure Act, a court may hold unlawful and set aside any agency action that is arbitrary and capricious, contrary to the Constitution or violative of a statute. 5 U.S.C. § 706(2).[12] However, "an agency's construction of its own regulation is entitled to substantial deference." *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986) (citing *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977)). The interpretation should not be reversed unless it is unreasonable or the agency has acted in an arbitrary or capricious manner. *Lehman v. Burnley,* 866 F.2d 33, 36 (2d Cir.1989). Deference to agency interpretation is consistent with the general principle that administrative regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute" which the agency administers. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also Cosgrove v. Sullivan,* 999 F.2d 630, 632–33 (2d Cir.1993) ("Reviewing courts must give the Secretary's interpretations deference with regard to a statute under his purview so long as it is a permissible construction of the statute.").

 Nevertheless, when a regulation is at odds with the clear intent of the statute, courts have determined not to defer to the agency's interpretation. *See New York City Health and Hosp. Corp. v. Perales,* 954 F.2d 854, 858 (2nd Cir.1992) (New York regulation limiting Medicare Part B cost-sharing coverage for patients who were dual eligible violated both the Medicare and Medicaid statutes). Indeed, since courts are the authoritative voice on issues of statutory construction, they "must reject administrative constructions

---

**11.** In their alternative claim, plaintiffs seek to invalidate the DSS and HRA policy and practice concerning corrective payments in the personal home care context. Plaintiffs allege that the DSS and HRA home care scheme, establishing a variety of Medicaid rates, often results in recipients being reimbursed at amounts less than what Medicaid would have paid for the service had it not erred. Inasmuch as the Court has determined to invalidate the overall policy of limiting corrective payments to the Medicaid rate, it need not address the special circumstances of corrective payments for home care services.

**12.** 5 U.S.C. § 706(2) provides in pertinent part:

[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ...
(2) hold unlawful and set aside any agency action, findings and conclusions found to be—
 (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right....

which are contrary to clear congressional intent." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. Likewise, if an agency's interpretation of a regulation is contrary to the clear intent of the statute it administers, the court must reject the agency's interpretation.

According to defendants, the policy of limiting reimbursement for expenses incurred as a result of agency error to the Medicaid rate is reasonable in that it requires a state to make, on a retroactive basis, precisely the same payments it would have made had the correct decision been made in the first place. Defendants argue that by adhering to a statutory principle that restricts Medicaid payments to a predetermined rate, their interpretation of the corrective action regulation is entitled to judicial deference.

■■■■ The deference due an administrative decision, however, depends on a number of factors, including the: (1) thoroughness of its consideration; (2) validity of its reasoning; and (3) consistency with earlier and later pronouncements. *Detsel v. Sullivan,* 895 F.2d 58, 65 (2d Cir.1990). Inasmuch as HHS has not enacted the reimbursement policy as a formal regulation, it is entitled to less deference as an unpublished "interpretive rule." Such rules "enjoy a lesser deference ... because of the absence of public opportunity to comment." *Samaritan Health Serv. v. Bowen,* 811 F.2d 1524, 1529 (D.C.Cir.1987). Defendants' reasoning is unpersuasive as well. They offer no specific explanation for the policy other than that it upholds a statutory principle necessary for implementing Medicaid in general. As will be shown, *infra,* the policy neither complies with other provisions in the Medicaid statute nor does it comport with constitutional principles.

### 2. *The Inconsistent Implementation of Defendants' Policy*

■■ In addition, defendants' policy has not been implemented consistently. " 'Patently inconsistent application of agency standards to similar situations lacks rationality and is arbitrary.' " *Vargas v. I.N.S.,* 938 F.2d 358, 362 (2d Cir.1991) (quoting *Contractors Transport Corp. v. United States,* 537

F.2d 1160, 1162 (4th Cir.1976)). Courts owe less deference to an agency interpretation of a regulation that is inconsistent with earlier and later pronouncements it has made, because "the [agency's] expertise ... to which we normally defer becomes dubious when the expert cannot make up its own mind." *New York City Health and Hosp. Corp. v. Perales,* 954 F.2d at 861–62; *see also Catholic Medical Ctr., Inc. v. N.L.R.B.,* 589 F.2d 1166, 1174 (2d Cir.1978) (agency's unexplained decision in deviating from precedent "is archetypical of arbitrary and capricious behavior").

Notwithstanding the O'Connor memo, HHS allowed the *Chenet* litigants to recover full reimbursement. *Chenet* resulted in a settlement which was approved by Judge Frank H. Freedman, United States District Judge for the District of Massachusetts, on January 11, 1985. The settlement agreement provided that the Massachusetts Department of Public Welfare agreed to directly reimburse individuals who paid medical bills prior to being accepted for SSI and Medicaid. Plaintiffs' 3(g) Statement Ex. L. The settlement specifically stated: "reimbursement shall be at the rate *actually paid* by the class members to their medical providers rather than at the Department's Medicaid rate." *Id.* (emphasis added). The settlement also indicated that on November 26, 1984, the Massachusetts Department sought approval from HHS for an amendment to its state plan permitting such reimbursement. *Id.*

On April 12, 1985, the Commissioner of the Massachusetts Department of Public Welfare sent a letter to HHS explaining the requested change in the Massachusetts Medicaid plan. The letter stated in pertinent part:

It is the Department's intention that an individual who has paid for medical services out of his own pocket following an erroneous eligibility decision by either the Social Security Administration or our Department *should be restored to the position he would have been in had the correct decision been made. The agencies administering public assistance programs should not be allowed to benefit from its mistakes at the expense of individual recipients of such assistance....* federal regulations require states to make corrective payments

retroactive to the date of an incorrect action and make federal financial participation available for such payments.

*Id.* Ex. N (emphasis added). On July 18, 1985, HHS approved the Massachusetts amendment providing for reimbursement at the rate actually paid by the recipients. *Id.* Ex O.

That *Chenet* resulted in a settlement whereby direct reimbursement was made for actual costs does not suggest that the reimbursement policy has been applied by HHS in an arbitrary and capricious fashion.[13] But that Massachusetts has now amended its Medicaid plan to provide for full reimbursement is more troubling. Unlike every other state that participates in Medicaid, Massachusetts has a policy that provides full reimbursement to recipients who have incurred expenses as a result of agency error. If the O'Connor memo and the State Manual need not apply to Massachusetts, then perhaps they are merely advisory and the policies they declare are not binding upon the states. Even more, the Massachusetts amendment arose out of the very own *Chenet* litigation that formally announced the policy. A court should not be constrained by judicial deference when the precise policy at issue has not even been adhered to in the case in which it was announced. Accordingly, this Court will not defer to defendants' interpretation of the corrective action regulation limiting reimbursement for corrective payments to the Medicaid rate and will now review the merits of the policy.

13. *Chenet* was not the only case in which Medicaid reimbursements were paid directly to recipients at amounts greater than the Medicaid rate. In *Lynch v. Rank,* Civ No. 83–2340 WHO (N.D.Cal.1985), a nationwide class action involving a statutory amendment that retroactively restored Medicaid eligibility to certain individuals, the court ordered that the beneficiaries be reimbursed at the Medicaid rate. Svolos Decl. ¶ 9. The *Lynch* order, however, was not applied to California plaintiffs, who arranged, through a settlement agreement, filed on April 2, 1985, to be reimbursed for "[a]ll expenditures ... in the amount in which they were incurred." Plaintiff's 3(g) Statement Ex. P. The Court notes that *Lynch* is only similar to the instant case and *Chenet* in that it involved direct reimbursement for actual costs. *Lynch,* however, deals with statutory eligibility requirements and has no bearing on the corrective payments' policy.

### B. *Statutory Claims*

According to plaintiffs, defendants' policy of limiting corrective payments to the Medicaid rate contravenes the Medicaid Act's own requirements. First, plaintiffs allege that the policy contradicts the statutory provision "that the medical assistance made available to any individual ... shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B) (the "comparability provision"). Second, plaintiffs contend that reduced corrective payments violates the Medicaid Act's restrictions on cost-sharing. *Id.* § 1396*o* (the "cost-sharing provision"). Finally, plaintiffs maintain that the policy is inconsistent with the Medicaid statute's requirement that services be provided "in a manner consistent with simplicity of administration and the best interests of the recipients." *Id.* § 1396a(a)(19) (the "best interests provision").[14]

#### 1. *The Comparability Provision*

Under the Medicaid statute, a state plan must ensure "that the medical assistance made available to any individual ... shall not be less in amount, duration or scope to any other such individual." Plaintiffs concede that defendants' policy does not promote inequality in amount, because all Medicaid recipients receive the same quantity of payments. Instead, plaintiffs argue that when victims of agency error and delay are forced to pay for services themselves,

14. Defendants' policy does not violate the best interests provision. Plaintiffs argue that it is in the "best interests" of recipients to provide reimbursement at the actual rate they were required to pay to obtain necessary services. However, what is in plaintiffs' best interests is not necessarily in the best interests of Medicaid recipients generally. The best interests provision refers to "recipients" in the aggregate, and what might be advantageous to plaintiffs might not be in the best interests of *all* Medicaid recipients. Moreover, inasmuch as reimbursement *for* actual costs involves review of each individual's particular expenditures, it is not clear that it would make Medicaid simpler to run administratively than the present policy of limiting reimbursement to the Medicaid rate.

they are not being provided services of equal scope with other recipients.

Plaintiffs offer no definition of scope that might lead the Court to find defendants' policy violative of the comparability provision. By its plain meaning, scope refers to "the general range or extent of . . . activity." *Webster's Third New International Dictionary* 2035 (1981). Scope of assistance, then, covers the types of activities, services and supplies provided by Medicaid or the categories of groups covered by the program. Plaintiffs would receive unequal scope of assistance if: (1) they were denied specific services covered by Medicaid, or (2) they were denied services because defendants decided not to reimburse those recipients who qualified for Medicaid through some other federal program, such as SSI or AFDC. Plaintiffs have not been denied the same types of Medicaid services as other recipients nor have they been discriminated against based on their belonging to a particular category of recipient. Consequently, the plain meaning of the comparability provision does not suggest that defendants' reimbursement policy fosters inequality of scope.

Similarly, the legislative history of the comparability provision offers no extended definition of scope upon which the Court may hold defendants' policy contrary to the intent of the provision. Under its section entitled "scope and definition of medical services," the legislative history outlines the particular types of services and groups of recipients covered by Medicaid. While Congress specifies the obvious groups and services covered by the program, it indicates that Medicaid is intended to support others as well. For example, Congress states that "the scope of the program includes not only the aged, blind, disabled and dependent children . . . but also children under the age of 21 (and their caretaker relatives) who come within the scope of title IV, except for need and age, even though they might not be defined as eligible under a particular State plan." H.R.Rep. No. 213, 89th Cong., 1st Sess; S.Rep. No. 404, 89th Cong., 1st Sess., Pt. 1, *reprinted in* 1965 U.S.Code Cong. & Ad. News 1943, 2020–21 (the "Legislative History"). Yet, nowhere does Congress enlarge

the definition of scope so that it refers to the circumstance where recipients incur expenses as a result of agency error or delay.

Indeed, the legislative history of 42 U.S.C. § 1396a(a)(10)(B)(i) simply emphasizes that the purpose of the comparability provision is to ensure that recipients who qualify as categorically needy under one form of federal assistance should receive the same "amount, duration, or scope" of assistance as those who qualify under another federal assistance program. Congress explains:

> medical assistance made available to persons receiving assistance under title I, IV, X, XIV, or XVI must not be less in amount, duration, or scope than that provided for persons receiving aid under any other of those titles. In other words, the amount, duration, and scope of medical assistance made available must be the same for all such persons. *This will assure comparable treatment for all of the needy aided under the federally aided categories of assistance.*

Legislative History at 2017 (emphasis added); *see also, Camacho v. Perales,* 786 F.2d 32, 39 (2d Cir.1986) (relying on similar legislative history covering the second prong of the comparability provision now codified in 42 U.S.C. § 1396a(a)(10)(B)(ii) to explain that categorically needy recipients should be treated comparable to medically needy recipients in "amount, duration, or scope").

Nonetheless, defendants' reimbursement policy does contravene the comparability provision. Medical assistance refers to monetary payment for medical services and care. Legislative History 2020. Thus, on the surface, "amount" of medical assistance means the quantity or the monetary sums expended. However, amount in the context of money, means more than just a number; it refers to the value of the sums expended. Money is a measure of value. "The value of a thing is what it will exchange for; the value of money is what money will exchange for; the purchasing power of money." *Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 275, 104 S.Ct. 1776, 1794, 80 L.Ed.2d 273 (1984) (quoting J. Mill, *Principles of Political Economy* 489 (1936)). In terms of purchasing power, plaintiffs are not being treated

equally to other Medicaid recipients. When plaintiffs are allotted the same amount of money Medicaid provides to other recipients, but are forced to pay for treatment or services which are furnished to ordinary Medicaid recipients without charge, plaintiffs have not received assistance equal in amount to the assistance received by these other recipients who pay nothing. As compared with other Medicaid recipients, plaintiffs' medical assistance has diminished in value.

### 2. The Cost–Sharing Provision

 As a general rule, Medicaid is designed to provide payment in full to the provider of the medical service and to permit co-payment by recipients only in limited circumstances. When cost-sharing is permitted, the statute emphasizes, in the cost-sharing provision, that "any deduction, cost-sharing or similar charge imposed under the plan ... will be *nominal* in amount." 42 U.S.C. § 1396o(b)(3) (emphasis added); *see also* 42 C.F.R. § 447.54(a)(3) (supplying chart setting maximum co-payment rates for recipients). Certain services and groups are exempt from co-payment requirements entirely, including: (1) minors; (2) pregnant women; (3) patients at medical care facilities such as hospitals or facilities for the mentally retarded; (4) emergency services; and (5) hospice services. 42 U.S.C. § 1396o(b)(2). Moreover, providers may not deny services to any recipient "on account of such individual's inability to pay a deduction, cost-sharing or similar charge." *Id.* § 1396o(e). The State plan must specify "the basis for determining whether an individual is unable to" make a co-payment "and the means by which such individuals will be identified to providers." 42 C.F.R. § 447.-53(d)(4).[15]

In 1987, HHS determined that Alaska's Medicaid plan violated the cost-sharing provision. Alaskan recipients, whose eligibility for Medicaid could not be documented at the time of admission, were required to pay providers deposits and were not refunded by Medicaid. HHS determined that:

if a provider collects a portion of the total payment from the recipient and that amount is not refunded to the recipient, either by the provider or the state, the recipient is, in effect, forced to pay unauthorized cost sharing charges. These cost sharing charges are unauthorized whether the lack of documentation supporting Medicaid eligibility is the fault of the recipient or someone else.

Plaintiffs 3(g) Statement Ex. R (Memo from Robert A. Streimer, Director Bureau of Eligibility, Reimbursement and Coverage April 7, 1987). In the instant case, as a consequence of erroneous determinations of ineligibility, the recipients were forced to pay more than just a portion of the payment for services; they had to pay for the services entirely and ended up paying even more than Medicaid would have paid.

Plaintiffs contributions were far from nominal. For example, between October 21, 1988 and November 3, 1988, the Greensteins expended $12.50 an hour for a twelve hour shift. However, Medicaid only reimbursed them at a rate of $6.50 an hour. As a result, over this fourteen day period, the Greensteins incurred $72 in daily expenses for a total of $1008. Similarly, Barbara Bogsted was reimbursed for only $574.79 of the $1874 in payments she made from her own funds as a result of Medicaid erroneously denying home care services to her mother. Finally, the Greenbergs paid 4834.24 in home care services for their mother during a period in

---

**15.** New York recently amended its Social Services Law to allow for cost-sharing in limited circumstances. Pursuant to the amendment, recipients may pay for particular services ranging from $.50 to $3.00 generally. The statute also sets caps on the maximum amount of payment. N.Y. Social Services Law § 367–a(6); *see also, Sweeney v. Bane,* 996 F.2d at 1385 (affirming denial of preliminary injunction halting implementation of the co-payment scheme).

New York exempts certain persons from co-payments in compliance with federal law. N.Y.

Social Services Law § 367–a(6)(d). Also, recipients who do not fall within any of the exemptions are not compelled to make a co-payment if unable to afford it. *Id.* § 367–a(6)(a). Providers may not deny services to an individual based on the inability to make a co-payment. *Id.* § 367–a(6)(g)(i). Under DSS regulations, once a recipient has stated that he or she cannot pay, the provider may not refuse to provide services. *Sweeney v. Bane,* 996 F.2d at 1386 (citing N.Y.Comp.Codes R. & Regs. tit xviii §§ 360-7.12(a) and 515.2(17).

which she was eligible for Medicaid and only received $3310.80 in reimbursement. In short, defendants' policy violates the cost-sharing provision inasmuch as it forces recipients, who incurred expenses as a result of agency error, to contribute more than nominal amounts in paying for medical services.

## C. Constitutional Claims

### 1. Equal Protection

■■■■ Regulatory classifications are valid under the equal protection clause whenever they bear a rational relationship to a legitimate state objective. *Regan v. Taxation with Representation*, 461 U.S. 540, 547, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983). Under this rational basis test, as long as the classification "has some reasonable basis, it does not offend the Constitution simply because the classification is not made with reasonable nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

■■■■ However, the rational basis test is "'not a toothless one;'" the classification scheme must "advance[] a reasonable and identifiable government objective." *Schweiker v. Wilson*, 450 U.S. 221, 234–35, 101 S.Ct. 1074, 1082–83, 67 L.Ed.2d 186 (1981) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976)). A reasonable classification is one that is "'not arbitrary'" and that is based "'upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920)).

■■■■ Both the O'Connor memo and the State Manual explain that the purpose in creating an exception to the vendor payment principle is to correct the inequitable situation that results from an erroneous determination made by the agency. The O'Connor memo adds that the policy's intention is to treat Medicaid recipients who acquire eligibility on appeal on the same basis as those whose eligibility was originally determined. Limiting corrective payments to the Medicaid rate does not further the purpose and intent of the policy. Medicaid recipients who are originally determined eligible receive services without any expenditure, but their counterparts, who become eligible only on appeal, have to pay the difference between the Medicaid rate and the actual cost of the needed assistance. The disparity between the Medicaid rate and the actual cost is not a light one either. Through economics of scale and longstanding contractual relationships with providers, Medicaid can establish rates that are much lower than market value. On the other hand, the individual who has been denied Medicaid and requires immediate medical assistance cannot obtain services at a discounted rate. The severe strain and hardship that such an individual experiences in acquiring these services only widens the divide between him and those initially declared eligible for Medicaid.

Defendants argue in conclusory fashion, however, that the policy furthers a legitimate state objective insofar as it helps prevent fraud and waste in the Medicaid program. While the Court can envision the possibility that recipients might defraud Medicaid by seeking direct reimbursement at an amount greater than it actually paid the provider, defendants have not identified the fraudulent schemes they are worried about, nor have they documented to what extent, if any, such fraud has been perpetrated. As a result, the Court deems it unnecessary to engage in a rational basis analysis inasmuch as there is absolutely no factual foundation on which to surmise the conceivability of defendants' stated objective.

■■■ In fact, it appears to this Court that defendants' failure to document evidence of fraud stems from the unlikelihood of elaborate schemes in the corrective payments' context. Recipients seeking reimbursement are required to submit extensive documentation proving actual expenditures, and the dates and times those expenditures were incurred. It is hard to imagine how an individual in desperate need of medical assistance

and who is at first denied eligibility to Medicaid would seek reimbursement as a way to defraud the Medicaid program.[16] However, in the event that defendants could seriously identify fraud prevention as a legitimate state objective in the corrective payments context, the Court would be bound to deny the equal protection claim.

### 2. Due Process

■ While defendants' policy of limiting corrective payments to the Medicaid rate might not violate equal protection, it does violate constitutional requirements of due process. In analyzing a procedural due process claim, a court follows a two step process. First, it must determine whether plaintiffs have a liberty or property interest protected by the Constitution. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Second, once the protected interest is identified, the court considers whether the government deprived plaintiffs of that interest without due process. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). "The second step of the analysis thus asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." *Narumanchi v. Bd. of Trustees,* 850 F.2d 70, 72 (2d Cir.1988).

■ A welfare entitlement is "property" protected by the Constitution. *Goldberg v. Kelly,* 397 U.S. 254, 262 n. 8, 90 S.Ct. 1011, 1017 n. 8, 25 L.Ed.2d 287 (1970). Qualified recipients require these benefits in order to obtain their "brutal needs"—the essential food, clothing, housing and medical care necessary to live. *Id.* at 264, 90 S.Ct. at 1018. Nevertheless, "[t]o have a property interest in a benefit, a person clearly must have more

than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must instead have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709.

■ According to defendants, corrective payments cannot be considered "brutal needs" because reimbursement implies that the recipient has already satisfied his medical needs. To the contrary, if Medicaid determines that a recipient deserves corrective payments, it has classified the recipient as one who requires that his brutal needs be protected. The question is not whether plaintiffs have a property interest in corrective payments, rather it is the extent to which those payments constitute such an interest.

Medicaid's purpose is to provide Medical assistance to those whose income and resources are insufficient to meet the costs of necessary medical services. 42 U.S.C. § 1396. The recipient's property interest, therefore, is the necessary health care that is provided or that should have been provided free of charge under the state's Medicaid program. That Medicaid has established discounted rates with providers participating in the program does not diminish plaintiffs' property interests. Plaintiffs were forced to obtain financial assistance for medical services from family members or charities. By being retroactively declared eligible for the program, the recipients were entitled to have Medicaid cover them for the full amount of Medical assistance they could not have paid for out of their *own* resources and income.

■ Having identified plaintiffs' property interest, the Court must now consider what process is due. Corrective payments are awarded to plaintiffs under the Medicaid statute as part of plaintiffs' right to a fair

---

**16.** That Medicaid is riddled by fraud is of serious concern. *See,* Herbert A. Posner, *Who Gets the Medicaid Dollar?* N.Y.L.J., September 2, 1993, at 2 ("A program of [Medicaid's] size not only attracts abuse from physicians and recipients, but it has also become the target of scam artists."). But defendants cannot justify every policy, including those that are patently unfair, as a way to prevent fraud. A state cannot base an invidious classification on grounds of fraud prevention, when there is no rational basis for believing that the group being discriminated against is more likely to commit fraud. *U.S. Dept. of Agri-*

*culture v. Moreno,* 413 U.S. 528, 536–38, 93 S.Ct. 2821, 2826–28, 37 L.Ed.2d 782 (1973). The Supreme Court has stated:

> We recognize that a state has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures.... But a state may not accomplish such a purpose by *invidious distinctions* between classes of its citizens.... The saving of welfare costs cannot justify an otherwise invidious classification.

*Shapiro v. Thompson,* 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969).

hearing. The Medicaid statute states: "A state plan for medical assistance must ... provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3). Therefore, pursuant to the Medicaid statute, plaintiffs are entitled to the minimum due process requirements of a fair hearing.

◼ In compliance with the principle of *ubi jus ibi remedium* ("where there is a right there is a remedy"), the statutory right to a fair hearing must include within it the right to effective redress. *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969) ("[t]he existence of a statutory right implies the existence of all necessary and appropriate remedies"); *see also, Bermudez v. U.S. Dept. of Agriculture,* 348 F.Supp. 1279, 1281 (D.D.C.1972) (federal policy of denying retroactive benefits under the Food Stamp program violated the fair hearing requirements of procedural due process), *aff'd,* 490 F.2d 718 (D.C.Cir.), *cert. denied,* 414 U.S. 1104, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973). If redress is not adequate, plaintiffs have been deprived of property without due process.

In defendants' view, any deprivation of property in this case should be considered random and unauthorized because it is the result of governmental error. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984); *see also, Parratt v. Taylor,* 451 U.S. 527, 543–44, 101 S.Ct. 1908, 1916–17, 68 L.Ed.2d 420 (1981) (for unauthorized negligent deprivations of property). Defendants argue that if plaintiffs are dissatisfied with the Fair Hearing determinations, they may seek review in New York courts through an Article 78 proceeding.

◼ However, this case does not challenge the specific errors or delays that resulted in a particular wrongful denial of Medicaid. Plaintiffs seek to invalidate defen-

dants' explicit and uncontroverted policy of refusing to reimburse them in full after an erroneous determination has been discovered. This policy is codified in New York's own Medicaid regulations and admittedly represents defendants' official interpretation of the corrective action regulation. A state actor implementing this policy cannot be said to have engaged in a random and unauthorized deprivation of property. Where "it is the state system itself that destroys a complainant's property interest, by operation of law" the deprivation of property cannot be considered random and unauthorized. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982). Accordingly, the Court finds that defendants' policy of limiting reimbursement for expenses incurred as a result of agency error to the Medicaid rate precludes plaintiffs from obtaining the necessary and appropriate remedy at a fair hearing and thus deprives plaintiffs of property without due process.

## CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motion for summary judgment and denies the cross-motions for summary judgment brought by both DSS and HRA.

Settle judgment on notice